UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE QR ENERGY LP UNITHOLDER
LITIGATION

Civil Action No. 4:14-cv-02195

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, FINAL CERTIFICATION OF A NON-OPT-OUT CLASS, AND AN AWARD OF REASONABLE ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................... 1

II.    THE LITIGATION AND BACKGROUND TO SETTLEMENT ...................................... 3

III.   THE SETTLEMENT TERMS ..................................................................................... 4

IV.    THE PROPOSED SETTLEMENT SHOULD BE FINALLY APPROVED .................... 5

    A.    The Fifth Circuit Favors Settlement of Class Actions and Presumes Fairness of Settlements Negotiated and Supported by Experienced and Competent Counsel.. 5

    B.    The Settlement Is Fair, Reasonable, and Adequate ................................................ 6

        1.    There Was and Is No Fraud or Collusion in Connection with the Settlement ................................................................................................ 7

        2.    The Complexity, Expense, and Likely Duration of this Litigation Supports the Settlement ..................................................................................... 7

        3.    The Stage of Proceedings and the Amount of Discovery Completed Weighs in Favor of Settlement .................................................................. 9

        4.    The Probability of Success on the Merits and the Possible Range of Recovery Supports the Settlement ........................................................... 10

            a.    The Damages Claim ............................................................... 11

            b.    The Disclosure Claims ........................................................... 17

                i.    Material Information Regarding Greenhill's and TPH's Financial Analyses ............................................ 18

                ii.   The Process and Negotiations Between QRE and Breitburn Leading up to the Signing of the Merger Agreement ........... 24

        5.    The Opinion of Plaintiffs' Counsel and Settlement Class Members ....... 32

            a.    The Supplemental Disclosures Provided Valuable Benefits to the Class ...................................................................................... 34

            b.    The Merger Consideration Was Not Inadequate .......................... 36

            c.    Certification of an Opt-Out Class Is Appropriate ......................... 44

V.     THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(a) ........................... 48

    A.    The Numerosity Requirement Is Satisfied ............................................................ 48

    B.    The Commonality Requirement Is Satisfied .......................................................... 49

    C.    The Typicality Requirement Is Satisfied ............................................................... 49

    D.    The Adequacy Requirement Is Satisfied ............................................................... 49

    E.    The Proposed Settlement Satisfies Rule 23(b) ...................................................... 50

VI.    THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR REASONABLE ATTORNEYS' FEES AND EXPENSES .................................................................... 52

i

A.   Plaintiffs Conferred a Substantial Benefit on QRE Unitholders ......................... 53

B.   Fee Awards in Similar Cases and the Rates Charged in Similar Litigation ......... 54

C.   The Experience, Reputation, and Ability of the Lawyers Performing the Services, the Time Limitations, and the Preclusion of Accepting Other Employment........ 57

D.   The Time and Labor Required, the Novelty and Difficulty of the Questions Involved, and the Skill Requisite to Perform the Legal Service Properly ............ 58

E.   Plaintiffs' Counsel Litigated the Actions on a Fully Contingent Basis ................ 58

VII.   CONCLUSION ............................................................................................................ 59

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ahearn v. Fibreboard Corp.*,
   162 F.R.D. 505 (N.D. Tex. 1995) .......................................... 49

*Allen v. El Paso Pipeline GP Company, LLC, et al.*,
   113 A.3d 176, 178 (Del. Ch. 2014) ....................................... 15

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
   650 A.2d 1270 (Del. 1994) ................................................. 31

*Ayers v. Thompson*,
   358 F.3d 356 (5th Cir. 2004) ......................................... 35, 52

*Blum v. Stenson*,
   465 U.S. 886 (1984) ......................................................... 57

*Boeing Co. v. Van Gernert*,
   444 U.S. 472 (1980) ......................................................... 54

*Brent v. Midland Funding, LLC*,
   2011 U.S. Dist. LEXIS 98763 (N.D. Ohio Sept. 11, 2011) ........... 7

*Call4U, Ltd. v. Goodman Global, Inc.*,
   No. 2007-66888 (Harris Cnty. Tex. May 13, 2009) ................... 55

*City Trading Fund v. Nye*,
   2015 N.Y. Misc. LEXIS 11 (N.Y. Sup. Ct. Jan. 7, 2015) ............ 36

*Collier v. Brightpoint, Inc.*,
   C.A. No. 1:12-cv-1016 (TWP)(DKL) (S.D. Ind. May 1, 2013) ..... 56

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ......................................... 5, 6

*Culpepper v. Reynolds Metals Co.*,
   442 F.2d 1078 (5th Cir. 1971) ............................................ 53

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) ................................... 5, 6, 7

*Dow Jones & Co. v. Shields*,
   1992 Del. Ch. LEXIS 24 (Del. Ch. Jan. 10, 1992). ................... 53

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
   630 F. Supp. 482 (E.D. Pa. 1985) ....................................... 49

*Fountain v. Avondale Indus., Inc.*,
   1996 U.S. Dist. LEXIS 5045 (E.D. La. Apr. 18, 1996) ............... 54

*Garza v. Sporting Goods Props.*,
   1996 U.S. Dist. LEXIS 2009 (W.D. Tex. Feb. 6, 1996) ......... 5, 6, 10

*Gilbert v. MPM Enters., Inc.*,
709 A.2d 663 (Del. Ch. 1997)........................................................................... 8

*Gilmartin v. Adobe Res. Corp.*,
No. 12467, 1992 Del. Ch. LEXIS 80 (Del. Ch. Apr. 6, 1992).......................... 9

*Gordon v. Verizon Commc'ns Inc.*,
2014 N.Y. Misc. LEXIS 5642 (N.Y. Sup. Ct. Dec. 19, 2014.......................... 36

*Hamilton v. First Am. Title Ins. Co.*,
266 F.R.D. 153 (N.D. Tex. 2010) ..................................................................... 50

*Hensley v. Eckerhart*,
461 U.S. 424 (1983).................................................................... 52, 54, 57

*Hollis v. Hill*,
232 F.3d 460 (5th Cir. 2000). ............................................................................ 8

*IBEW Local 164 Pension Fund v. Hewitt Assocs., Inc.*,
No. 10 CH 31612 (Cook Cnty. Ill. Cir. Ct. Feb. 15, 2011)............................. 56

*In re Aeroflex S'holders Litig.*,
No. 003943/2007 (Nassau Cnty., N.Y. June 30, 2009) ................................... 56

*In re Appraisal of Shell Oil Co.*,
1990 Del. Ch. LEXIS 199 (Del. Ch. Dec. 11, 1990) ........................................ 8

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000)................................................................. 7

*In re Celera Corp. S'holder Litig.*,
2012 Del. Ch. LEXIS 66 (Del. Ch. Mar. 23, 2012) ....................................... 27

*In re Celera Corp. S'holder Litig.*,
59 A.3d 418 (Del. 2012) ............................................................................ 46, 47

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
2013 U.S. Dist. LEXIS 155091 (C.D. Cal. Oct. 25, 2013)............................. 51

*In re Corrugated Container Antitrust Litig.*,
643 F.2d 195 (5th Cir. 1981). ............................................................................ 5

*In re Crestwood Midstream Partners.*,
No. 4:13-cv-01528, slip op. (S.D. Tex. May 16, 2014)............................ 45, 55

*In re Dell, Inc., Sec. Litig.*,
2010 U.S. Dist. LEXIS 58281 (W.D. Tex. June 11, 2010)............................. 59

*In re Delphi Corp. Sec., Deriv. & ERISA Litig.*,
248 F.R.D. 483 (E.D. Mich. 2008). ................................................................. 58

*In re El Paso Corp. S'holders Litig.*,
41 A.3d 432 (Del. Ch. 2012)............................................................................ 17

*In re FLS Holdings, Inc. S'holders Litig.*,
1993 Del. Ch. LEXIS 57, at *16 (Del. Ch. Apr. 2, 1993)............................... 55

*In re Ikon Office Solutions*,
   194 F.R.D. 166 (E.D. Pa. 2000)................................................................... 54

*In re Lease Oil Antitrust Litig.*,
   186 F.R.D. 403 (S.D. Tex. 1999)................................................................. 10

*In re MetroCorp Bancshares S'holders Litig.*,
   No. 4:13-cv-03198 (S.D. Tex. 2013) .......................................................... 55

*In re Nationwide Fin. Servs. Litig.*,
   No. 2:08-CV-00249, 2009 U.S. Dist. LEXIS 136962 (S.D. Ohio Aug. 18, 2009).............. 45, 52

*In re Netsmart Techs., Inc. S'holders Litig.*,
   924 A.2d 171 (Del. Ch. 2007)............................................................. 19, 35

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
   No. 888, 1994 U.S. Dist. LEXIS 6621 (E.D. La. May 18, 1994) ............................ 59

*In re Pure Res., Inc., S'holders Litig.*,
   808 A2d 421, 449 (Del. Ch. 2002)........................................................... 19

*In re Radiology Associates, Inc.*,
   611 A.2d 485 (Del. Ch. 1991)............................................................... 27

*In re Staples, Inc. S'holders Litig.*,
   792 A.2d 934 (Del. Ch. 2001) ..................................................... 9, 17, 35, 55

*In re Talley Indus., Inc. S'holders Litig.*,
   No. 15961, 1998 Del. Ch. LEXIS 53, at *46 (Del. Ch. Apr. 13, 1998).................... 35, 55

*In re Topps Co. S'holders Litig.*,
   926 A.2d 58 (Del. Ch. 2007)................................................................ 19

*In re Wm. Wrigley Jr. Co. S'holders Litig.*,
   No. 3750-VCL, 2009 Del. Ch. LEXIS 12 (Del. Ch. Jan. 22, 2009) ......................... 17

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ............................................................... 8

*Jinks v. Mays*,
   464 F.2d 1223 (5th Cir. 1972) ............................................................. 53

*Johnson v. Ga. Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) .............................................................. 37

*Lazy Oil, Co. v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997)......................................................... 7

*Lightbourn v. Cnty. of El Paso*,
   118 F.3d 421 (5th Cir. 1997) .............................................................. 49

*Lohocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004)........................................................... 59

*Major v. Treen*,
   700 F. Supp. 1422 (E.D. La. 1988)......................................................... 57

*Manchaca v. Chater,*
   927 F. Supp. 962 (E.D. Tex. 1996) ................................................................. 10

*Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.,*
   11 A.3d 1175 (Del. Ch. 2010) ........................................................................ 19

*McKittrick v. Gardner,*
   378 F.2d 872 (4th Cir. 1967) ......................................................................... 37

*McNary v. Am. Sav. & Loan Ass'n,*
   76 F.R.D. 644 (N.D. Tex. 1977) ....................................................................... 6

*Mills v. Electric Auto-Lite Co.,*
   396 U.S. 375 (1970) ...................................................................................... 54

*Milstein v. Huck,*
   600 F. Supp. 254 (E.D.N.Y. 1984) ................................................................... 8

*Mullen v. Treasure Chest Casino LLC,*
   186 F.3d 620 (5th Cir. 1999) ......................................................................... 49

*Murillo v. Tex. A&M Univ. Sys.,*
   921 F. Supp. 443 (S.D. Tex. 1996) ................................................................... 6

*Nichting v. DPL, Inc.,*
   No. 3:11-cv-141 (S.D. Ohio Feb. 24, 2012) ................................................... 56

*ONTI, Inc. v. Integra Bank,*
   751 A.2d 904 (Del. Ch. 1999) ........................................................................ 20

*Pa. v. Del. Valley Citizens' Council for Clean Air,*
   478 U.S. 546 (1986) ...................................................................................... 57

*PaineWebber R & D Partners II, L.P. v. Centocor, Inc.,*
   No. 14405, 2000 Del. Ch. LEXIS 12 (Del. Ch. Jan. 31, 2000). ....................... 53

*Paramount Commc'ns, Inc. v. QVC Network, Inc.,*
   637 A.2d 34 (Del. 1994) ................................................................................ 19

*Parker v. Anderson,*
   667 F.2d 1204 (5th Cir. 1982) ......................................................................... 7

*Philips v. Texas Indus., Inc. et al,*
   No. 3:14-cv-00740-B (N.D. Tex. 2014) .......................................................... 55

*Plumbers Local #65 Pension Fund v. Nicor Inc.,*
   No. 10-CH-52627, slip op. (Cook Cnty. Ill. Cir. Ct. Dec. 7, 2011) .................. 56

*Pompano Beach Police & Firefighters' Ret. Sys. v. Odyssey Healthcare, Inc.,*
   No. CC-10-03561-E, slip op. (Dallas Cnty. Tex. May 18, 2012) ..................... 55

*Powell v. Comm'r of Internal Revenue,*
   891 F.2d 1167 (5th Cir. 1990) ....................................................................... 57

*Prescott Grp. Small Cap, L.P. v. Coleman Co.,*
   2004 Del. Ch. LEXIS 131 (Del. Ch. Sept. 8, 2004) ......................................... 27

*Purdie v. Ace Cash Express, Inc.*,
   No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. Dec. 11, 2003) ..................... 7

*Quintanilla v. A & R Demolition Inc.*,
   No. H-04-1965, 2008 U.S. Dist. LEXIS 37449 (S.D. Tex. May 7, 2008)................................ 53

*Ranger Ins. Co. v. Algie*,
   482 F.2d 861 (5th Cir. 1973) ................................................................................ 31

*Reed v. Gen. Motors Corp.*,
   703 F.2d 170 (5th Cir. 1983) ..................................................................... 5, 7, 10

*Reis v. Hazelett Strip-Casting Corp.*,
   28 A.3d 442 (Del. Ch. 2011)................................................................................ 27

*Ressler v. Jacobson*,
   149 F.R.D. 651 (M.D. Fla. 1992)......................................................................... 57

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*,
   506 A.2d 173 (Del. 1986) ................................................................................... 44

*Rodriguez v. Countrywide Home Loans, Inc.*,
   695 F.3d 360 (5th Cir. 2012). .................................................................... 45, 51

*Salinas v. Roadway Express, Inc.*,
   802 F.2d 787 (5th Cir. 1986). ............................................................................. 7

*Spencer v. Comserv Corp.*,
   No. 4-84-794, 1986 U.S. Dist. LEXIS 15863 (D. Minn. Dec. 30, 1986) ................. 57

*Stein v. Pactiv Corp.*,
   No. 10-CH-35455, slip op.(Cook Cnty. Ill. Cir. Ct. Apr. 26, 2011)......................... 56

*Stott v. Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011). ..................................................................... 49

*Turberg v. ArcSight*,
   No. 5821-VCL (Del. Ch. Sept. 20, 2011) .................................................. 19, 27, 29

*Unger v. Amedisys, Inc.*,
   401 F.3d 316 (5th Cir. 2005) .............................................................................. 50

*United States v. Tex. Educ. Agency*,
   679 F.2d 1104 (5th Cir. 1982) ............................................................................. 6

*United Vanguard Fund v. TakeCare, Inc.*,
   693 A.2d 1076 (Del. 1997) ................................................................................. 53

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)....................................................................................... 45

*Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*,
   396 F.3d 96 (2d. Cir. 2005)................................................................................ 32

*Weeks v. S. Bell Tel. & Tel. Co.*,
   467 F.2d 95 (5th Cir. 1972) ................................................................................ 53

*Young v. Katz*,
447 F.2d 431 (5th Cir. 1971) ............................................................................ 5

**Other Authorities**

Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and
Mergers and Acquisitions*, 113 (2d ed. 2013) ........................................................ 26


**Rules**

Fed. R. Civ. P. 23. .................................................................................... passim

Tex. Disciplinary R. Prof'l Conduct Rule 1.04(b) ...................................................... 53

**Treatises**

4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.41 (4th ed. 2002). ........... 5

Pratt, Shannon P. *The Market Approach to Valuing Businesses*, 2nd ed. Hoboken: John Wiley &
Sons, 2005: 35 ............................................................................ 19, 21

Plaintiffs Samuel R. Hoefgen, Harry J. Taylor, as Grantee for Roy E. Toler, Michelle Burt, Michael Taylor and Jennifer Taylor, and Stephen Bushansky (collectively, "Plaintiffs"), who at all relevant times were unitholders of QR Energy, LP, ("QRE" or the "Partnership"), respectfully submit this memorandum in support of Plaintiffs' application for: (i) final approval of the April 24, 2015 stipulation of settlement ("Stipulation" or "Settlement")[1] settling these actions (the "Actions")[2]; (ii) final certification of a non-opt-out class (the "Settlement Class") of all record holders and beneficial owners of any unit(s) of QRE at any time beginning on and including July 24, 2014, through and including November 18, 2014[3]; and (iii) an award of reasonable attorneys' fees and expenses not to exceed $472,500.00 for services rendered by Plaintiffs' Counsel.[4] For the reasons set forth below, Plaintiffs respectfully request that the Court approve the Settlement including the application for attorneys' fees and expenses.

## I.    INTRODUCTION

As set forth herein and in the accompanying declaration of Thomas E. Bilek in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Certification of the Settlement Class, and An Award of Attorneys' Fees and Expenses ("Bilek Declaration" or "Bilek Decl."), the Settlement is fair, reasonable, and adequate, and the requested amount of attorneys' fees and expenses is reasonable compensation for the benefits achieved and the work performed on behalf of QRE unitholders.

---

[1] Unless expressly provided herein, all capitalized terms shall have the same meaning and/or definitions as set forth in the Stipulation.

[2] A copy of the Stipulation was attached as Exhibit 1 to the Declaration of Thomas E. Bilek in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.

[3] The Class is fully defined in Paragraph 18 of the Stipulation.

[4] WeissLaw LLP (the "Weiss Firm"), Levi & Korsinsky LLP ("Levi & Korsinsky") and Brodsky & Smith, LLC ("Brodsky & Smith") and The Bilek Law Firm LLP (the "Bilek Firm") were preliminarily approved as class counsel and liaison counsel, respectively. *See* Preliminary Approval Order dated April 29, 2015 at ¶ 2 (ECF No. 21).

The Settlement is the product of vigorous adversarial litigation in a compressed period of time that provided valuable benefits to the Settlement Class, which included material disclosures regarding, *inter alia*: (i) the process and negotiations between QRE and Breitburn leading up to the signing of the Merger Agreement; and (ii) the financial analyses performed by QRE's financial advisors Greenhill & Co., LLC ("Greenhill"),  and Tudor, Pickering, Holt & Co. Securities ("TPH," together with Greenhill, the "Financial Advisors") in advising the Board and Conflicts Committee and rendering their fairness opinions on the Merger (defined below) (the "Supplemental Disclosures").   The Settlement was consummated following arm's-length negotiations between highly experienced counsel and represents an excellent resolution of this complex case.[5]

The reaction of the Settlement Class strongly supports that conclusion.  Pursuant to the Preliminary Approval Order, QRE was directed to mail the Notice of Pendency of Class Action, Proposed Settlement of Class Action, and Settlement Hearing ("Notice") to all Persons who held of record QRE common stock during the class.[6]  Objections to the Settlement are not due until August 30, 2015 (10 days prior to the Settlement Hearing), but, as of the date of this memorandum, Plaintiffs' counsel are only aware of one objection (*see* infra., Section IV B.5.a-c).  Based on these circumstances, the Settling Parties consider the proposed Settlement to be fair, reasonable, and adequate and respectfully request the Court to finally approve the Settlement.

---

[5] The Actions centered around the merger of QRE with Breitburn Energy Partners LP ("Breitburn"). Under the terms of the July 23, 2014 Merger Agreement, Breitburn acquired QRE for 0.9856 common units of Breitburn for  each  QRE unit (the "Merger").  Bilek Decl., ¶5.

6 Defendants were required under the Preliminary Order to disseminate the Notice by May 13, 2015. Plaintiffs' Counsel have conferred with Defense Counsel and understand that the notice distribution requirements in the Preliminary Order have been met.

II.     **THE LITIGATION AND BACKGROUND TO SETTLEMENT**

An overview of the facts of this Action are set forth in the Stipulation and also are summarized in the Bilek Declaration.

Throughout the litigation, Plaintiffs' Counsel conducted a thorough investigation into the facts and law relating to the claims alleged in the Action.  For instance, Plaintiffs retained and consulted with a financial expert, and reviewed with the expert the Form S-4 Registration Statement (together with any exhibits and annexes attached thereto, and as amended or supplemented from time to time, the "Registration Statement"),[7] which, among other things, summarized the Merger Agreement, provided an account of the events leading up to the execution of the Merger Agreement, and summarized the financial analyses conducted by Greenhill, who served as one of the financial advisors to the Board of Directors of QRE GP (the "Board"), and TPH, who served as the financial advisor to the QRE GP Conflicts Committee ("Conflicts Committee"), and the Supplemental Disclosures, discovery materials, and relevant public information.  Plaintiffs' expert, Matthew R. Morris, CFA, CLP of RGL Forensics, has submitted an affidavit in support of the Settlement (a copy of which is attached to the Bilek Decl. as Exhibit 2).  After fully analyzing the merits of the Parties' contentions, including the benefits to QRE unitholders, Plaintiffs and Plaintiffs' Counsel entered into the Stipulation providing for the Settlement described below.  Importantly, during the negotiations, the Parties had a clear view of the strengths and weaknesses of their respective claims and defenses, and the Settlement is the product of arms'-length negotiations between the Parties, who were all represented by counsel with extensive experience and expertise in shareholder litigation.

---

[7] Bilek Decl., Ex. 1.

In addition, after agreeing to all of the substantive terms of the Settlement, the Parties negotiated Plaintiffs' Counsel's request for fees and expenses.  As a result of these arm's-length negotiations, Defendants agreed to pay Plaintiffs' Counsel up to $472,500.00 for all of their fees and expenses, subject to Court approval.[8]

The Parties filed the executed Stipulation with the Court on April 24, 2015.  Attached as exhibits to the Stipulation were a copy of a proposed Preliminary Order, a proposed form of Notice, and a proposed Final Judgment.

The Court entered the Preliminary Approval Order on April 29, 2015, which, *inter alia*, preliminarily certified the Settlement Class, preliminarily approved the Stipulation, set the date for the hearing concerning the Settlement Hearing for September 10, 2015, approved the form and method of the Summary Notice and Notice, and directed Defendants to mail the Notice to the Settlement Class.  *See* Bilek Decl. ¶ 21.

## III.    THE SETTLEMENT TERMS

The Settlement required QRE to disclose certain information to members of the Settlement Class that Plaintiffs believed were material and critical to their ability to make a fully-informed decision regarding whether to vote for, or against, the Merger.  The Supplemental Disclosures, which are set forth in a Form 8-K filed with the United States Securities and Exchange Commission (the "SEC") on November 10, 2014,[9] provided information to QRE unitholders in advance of the unitholder's vote concerning (i) the process and negotiations between QRE and Breitburn leading up to the signing of the Merger Agreement; and (ii) the

---

[8] The award of attorneys' fees and expenses will not impact the equitable relief obtained for the Settlement Class given that QRE, its successor in interest, and/or its insurers have agreed to bear the full cost of an award of attorneys' fees and expenses up to $472,500.00.

[9] *See* Bilek Decl., Ex. 3.

4

financial analyses performed by QRE's financial advisors Greenhill and TPH in rendering their fairness opinions on the Merger.  The Supplemental Disclosures are summarized in more detail in the Morris Decl., and examined in Section IV B.4.b.i, *infra*.

The Stipulation provides that, if the Court approves the Settlement, and in consideration of the Supplemental Disclosures, Plaintiffs, on behalf of the Settlement Class, agree to release all claims asserted against Defendants in the Action or in any action, proceeding, or shareholder demand involving the facts and circumstances that gave rise to the Action.

## IV.    THE PROPOSED SETTLEMENT SHOULD BE FINALLY APPROVED

### A.    The Fifth Circuit Favors Settlement of Class Actions and Presumes Fairness of Settlements Negotiated and Supported by Experienced and Competent Counsel

The standard for reviewing a proposed class action settlement is whether the proposed settlement is "fair, adequate and reasonable," and has been entered into without collusion between the parties.  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981); *Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004).

When evaluating the fairness of a proposed class settlement, the trial judge "must not try the case in the settlement hearings because 'the very purpose of the compromise is to avoid the delay and expense of such a trial.'"  *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)).  "[T]here is a strong presumption in favor of finding the Settlement Agreement fair.  The proposed settlement is not required to 'achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation.'  Rather, compromise is the essence of settlement . . . ."  *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 286 (W.D. Tex. 2007) (quoting *Garza v. Sporting Goods Props.*, No. SA-93-CA-1082, 1996 U.S. Dist. LEXIS 2009, at *41

(W.D. Tex. Feb. 6, 1996)) (citation omitted).  Thus, a court "generally will consider the facts of a settlement in a light favorable to promoting settlements."  *McNary v. Am. Sav. & Loan Ass'n*, 76 F.R.D. 644, 648 (N.D. Tex. 1977).[10]

Where experienced counsel have negotiated a settlement at arm's-length, courts accord class counsel's opinion great weight, and presume the compromise is fair and reasonable.  *United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982); *Murillo v. Tex. A&M Univ. Sys.*, 921 F. Supp. 443, 445 (S.D. Tex. 1996) (citing Newberg, *supra* § 11.42).  Thus, the court "is entitled to rely upon the judgment of experienced counsel," and "[i]ndeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."  *Cotton*, 559 F.2d at 1330; *see also DeHoyos*, 240 F.R.D. at 286 (holding that "the Court may rely on the judgment of experienced counsel for the parties" when evaluating a settlement) (citing *Garza*, 1996 U.S. Dist. LEXIS 2009, at *41).

Here, the Settlement was reached by experienced, fully-informed counsel and through vigorous arm's-length negotiations.  Thus, the Court should accord significant weight to Plaintiffs' Counsel's support of the Settlement and presume that the Settlement is fair and reasonable.

### B.    The Settlement Is Fair, Reasonable, and Adequate

Once satisfied that counsel adequately represented the class and has bargained for the proposed settlement in good faith, the "'only question' for the Court 'is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'"  *McNary*, 76 F.R.D. at 649.  The Fifth Circuit considers the following six factors in determining whether to approve a

---

[10] In addition, "there is an overriding public interest in favor of settlement [of class actions]," because such suits "have a well deserved reputation as being most complex."  *Cotton*, 559 F.2d at 1331; *see also* 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.41 (4th ed. 2002).

proposed settlement: (i) The existence of fraud or collusion behind the settlement; (ii) The complexity, expense, and likely duration of the litigation; (ii) The stage of the proceedings and the amount of discovery completed; (iv) The probability of plaintiffs' success on the merits; (v) The range of possible recovery; and (vi) The opinions of class counsel, class representatives, and absent class members. *Reed*, 703 F.2d at 172 (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)); *see also Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 789 (5th Cir. 1986). The Settlement satisfies these criteria.

### 1. There Was and Is No Fraud or Collusion in Connection with the Settlement

Courts in this jurisdiction presume that settlement negotiations are free from fraud and collusion, unless affirmative evidence indicates otherwise. *DeHoyos*, 240 F.R.D. at 287; *Purdie v. Ace Cash Express, Inc.*, No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547, at *19 (N.D. Tex. Dec. 11, 2003) (rejecting claim of fraud or collusion because objector pointed to no evidence in record supporting her claim).

The Settlement was reached only after extensive and hard-fought arm's-length negotiations by counsel experienced in complex class actions. There is not, nor has there been any suggestion of, collusion between well-respected counsel for Plaintiffs and Defendants.

### 2. The Complexity, Expense, and Likely Duration of this Litigation Supports the Settlement

"'Most class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them.'" *Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 U.S. Dist. LEXIS 98763, at *43 (N.D. Ohio Sept. 11, 2011) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000)). As a result, "[i]n most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Id.* (internal

quotations omitted).  Accordingly, courts have consistently held that "[t]he expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement." *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984); *Isby v. Bayh*, 75 F.3d 1191, 1198-99 (7th Cir. 1996) (holding that in determining the "fairness" of class action settlements, district courts will employ a number of factors including an assessment of the likely complexity, length, and expense of the litigation.); *Lazy Oil, Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 340 (W.D. Pa. 1997) ("'[I]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'").

These considerations are fully applicable here.  The Amended Complaint originally challenged the offer price for the Partnership's units as well as the adequacy of disclosures in the Registration Statement. However, valuation issues frequently become a battle of experts and courts are often skeptical regarding competing expert testimony.  *See, e.g.*, *Gilbert v. MPM Enters., Inc.*, 709 A.2d 663, 673 (Del. Ch. 1997); *In re Appraisal of Shell Oil Co.*, No. 8080, 1990 Del. Ch. LEXIS 199 (Del. Ch. Dec. 11, 1990), *aff'd*, 607 A.2d 1213 (Del. 1992); *Kahn v. Sullivan*, 594 A.2d 48, 62 (Del. 1991).[11]  The Action presents these (and other) complex issues, which after trial, would likely be followed by an appeal.  Consequently, significant legal and financial resources would be expended in that effort.  The Settlement that required the dissemination of the Supplemental Disclosures prior to the vote on the Merger obviates the need to litigate any of these issues and the concomitant expense.  Thus, this factor supports approval of the Settlement.

Indeed, where there are material deficiencies in disclosure documents seeking shareholder approval, courts have held that the preferred remedy is disclosure before the merger.

---

[11]  Texas federal courts have recognized that "Delaware courts are often influential in matters of corporate law . . . ."  *See Hollis v. Hill*, 232 F.3d 460, 469 (5th Cir. 2000).

*See, e.g.*, *Gilmartin v. Adobe Res. Corp.*, No. 12467, 1992 Del. Ch. LEXIS 80, at \*43 (Del. Ch. Apr. 6, 1992) (granting plaintiff's motion for a preliminary injunction and holding "[t]he right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages");

> [O]ur cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.  An injunctive remedy of that nature specifically vindicates the stockholder right at issue—the right to receive fair disclosure of the material facts necessary to cast a fully informed vote—in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

*In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001).

In this case, Plaintiffs ensured that QRE unitholders received the Supplemental Disclosures in advance of the vote on the Merger, thereby providing QRE unitholders with the material information and permitting them to make an informed decision before casting their votes on the Merger.

### 3.   The Stage of Proceedings and the Amount of Discovery Completed Weighs in Favor of Settlement

Plaintiffs' Counsel obtained and thoroughly reviewed on an expedited basis substantial documentation, including QRE GP Board minutes, Conflicts Committee minutes and presentations to the QRE GP Board and Conflicts Committee by Greenhill and TPH.  Plaintiffs' Counsel also conferred with Mr. Morris, their finance and valuation expert concerning the issues in the Action, particularly the adequacy of the disclosures in the Registration Statement, the adequacy of the Merger Consideration, the propriety of the Financial Advisors, and ultimately the availability of damages and other relief.  *See* Morris Decl. ¶¶ 2, 8; Bilek Decl. ¶¶ 17, 18. Plaintiffs' Counsel also reviewed additional non-public documents produced by Defendants and conducted the depositions of QRE Director and Conflicts Committee Member Richard K.

Herbert and TPH representative Lance Gilliland (documents and depositions together, the "Confirmatory Discovery").

Further ensuring that settlement negotiations were extensive and adversarial, Plaintiffs' Counsel and Defendants' counsel exchanged proposals and counter-proposals concerning the nature and scope of the Supplemental Disclosures.  Ultimately, Defendants agreed to provide QRE unitholders with more specific information that addressed many of the issues raised by Plaintiffs in the Amended Complaint.

Plaintiffs' Counsel thus determined that the Settlement was fair, reasonable, and adequate only after reviewing public and private documents, as well as considering the testimony of the confirmatory depositions.  Therefore, the parties reached an agreement to settle with a "full understanding of the legal and factual issues surrounding this case."  *Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D. Tex. 1996).  This factor therefore supports approval of the Settlement.

### 4.    The Probability of Success on the Merits and the Possible Range of Recovery Supports the Settlement

In analyzing the factors of probability of success on the merits, possible range of recovery, and certainty of damages, the court is guided by two principles: "'The Settlement terms should be compared with the likely rewards the class would have received following a successful trial' and 'the strength of the case for plaintiffs must be balanced against the amount offered in settlement.'"  *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 433 (S.D. Tex. 1999).  "However, the court is not to decide the issues or try the case via the fairness hearing because, 'the very purpose of the compromise is to avoid the delay and expense of such a trial.'"  *Garza*, 1996 U.S. Dist. LEXIS 2009, at *49 (citing *Reed*, 703 F.2d at 172).

### a.      The Damages Claim

While Plaintiffs believe their claims were meritorious when filed, through investigation, discovery, and consultation with their valuation expert, Plaintiffs and Plaintiffs' Counsel concluded that, with the exception of their disclosure claims, their chances of success on the other claims pled in the Amended Complaint (and in particular those relating to monetary damages) would have been an uphill battle under the particular circumstances and controlling case law.[12]

Plaintiffs would have argued that: (i) certain Wall Street analysts set target prices for QRE as high as $23.00-$24.50 per unit; (ii) QRE's revenue and profits were exceeding expectations quarter after quarter[13]; (iii) the members of the Board did not conduct an adequate evaluation of the financial merits of the Proposed Transaction; and (iv) QRE and Breitburn aided and abetted the Individual Defendants' breaches of fiduciary duty.

Defendants would have likely countered that the Merger had various advantageous aspects that were in the best interests of QRE unitholders.  Defendants would have argued that (i) the approximate $22.48 per unit offer represented a premium of approximately 19% above the $18.87 closing price of QRE common units on July 23, 2014, based on the $22.81 closing price of Breitburn common units on July 23, 2014 (the last trading day before the announcement of the Merger Agreement and the date on which the Conflicts Committee approved the Merger Agreement), and a premium of approximately 18% based on the average of the closing prices of QRE common units over the 30 trading days ended July 23, 2014; (ii) the $22.48 per common

---

[12] Bilek Decl. ¶¶17, 18, 24, 26-27.

[13] Bilek Decl., Exs. 4, 5.  QR Energy's May 7, 2014 and July 24, 2014 press releases announcing the Partnership's first quarter 2014 and second quarter 2014 results, respectively.

unit implied by the exchange ratio was greater than any closing price of QRE common units since April 2012; (iii) that there was an active bidding process where QRE solicited indications of interests from 6 upstream MLPs that QRE believed were large enough to acquire QRE, four of which declined to participate, and of the two who made indications of interest, only Breitburn's offer was high enough to justify further meaningful discussion; (iv) that while QRE was in a competitive industry and identifying reserves was extremely challenging and would become more challenging; (v) that the Board intended, and the transaction was, tax-free to QRE unitholders other than the holders of QRE Class C convertible preferred units; and (vi) through negotiation, the Conflicts Committee was able to increase by 4% the number of units offered by Breitburn from what Breitburn proposed on May 12, 2014 (Registration Statement, at 62, 65, 66).

Significantly, Defendants would have also argued that the QRE Limited Partnership Agreement ("QRE LPA"), in accordance with Delaware law[14], properly and expressly eliminated any common law fiduciary duties owed by Defendants.  As such, Defendants would have argued that that they did not violate the QRE LPA because they hired and relied on non-conflicted

---

[14] "The Delaware Revised Uniform Limited Partnership Act (DRULPA) gives 'maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.'  Parties may expand, restrict, or eliminate any fiduciary duties that a partner or other person might otherwise owe, but they 'may not eliminate the implied contractual covenant of good faith and fair dealing.'"  *Norton v. K-Sea Transportation Partners, LP, et al.,* 67 A.3d 354, 360 (Del. 2013) (citations omitted).  However, while the implied covenant of good faith and fair dealing cannot be contracted away, it is exceedingly difficult to prove such a breach, and under controlling Delaware law would require either subjective bad faith (meaning intentional, knowing bad faith) or a conscious disregard of a contractual duty, which amounts to something so egregious as to be inexplicable on any grounds other than subjective bad faith. Moreover, Delaware courts have held that the implied covenant is only a "gap filler" that cannot form the basis of a claim based on conduct expressly authorized by a limited partnership agreement.  *Gerber v. Enterprise Products Holdings, LLC,* 2012 Del. Ch. LEXIS 5 (Jan. 6, 2012).

financial advisors with industry experience who rendered reliable informed advice, established a Conflicts Committee[15] and otherwise complied with their express and implied contractual duties.

Defendants would have certainly asserted that the Conflicts Committee was properly constituted, populated and well informed through its retention and reliance on its own financial advisor[16]such that it could evaluate the terms of the transaction, actively negotiate for the benefit of the unaffiliated QRE unitholders and recommend a transaction that was in the best interests of QRE's unaffiliated unitholders.   Moreover, Defendants would have argued that (i) the compensation of the Conflicts Committee members was in no way contingent on their approving the Merger Agreement; (ii) the members of the Conflicts Committee would not personally benefit from completion of the Merger in a manner different from unaffiliated QRE common unitholders; (iii) the Conflicts Committee had no obligation to recommend any transaction; and (iv) any significant actions to be taken and decisions to be made by QRE and its Board under the Merger Agreement would be determined by the Conflicts Committee.

---

[15] Bilek Decl., Ex. 6 (QRE LPA, Section 1.1, defining Conflicts Committee as "a committee of the Board of Directors composed entirely of one or more directors who (a) are not (i) officers or employees of the General Partner, (ii) officers, directors or employees of any Affiliate of the General Partner (other than Group Members) or (iii) holders of any ownership interest in the General Partner or any of its Affiliates, including any Group Member other than Common Units, or securities exercisable, convertible into or exchangeable for Common Units and (b) also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which any class of Partnership Interests is listed or admitted to trading.")

[16] *See also Norton v. K-Sea Transportation Partners, LP, et al.*, 67 A.3d at 367-68 (holding that an appropriate fairness opinion from an investment banker satisfied the general partner's "contractual duty to exercise its discretion in "good faith,'" as the limited partnership agreement defined the term); *Gerber v. Enterprise Products Holdings, LLC, et al.,* 67 A.3d 400, 419 (Del. 2013) (construing a similar provision to entitle a general partner to a conclusive presumption that its contractual duty of good faith had been satisfied "if [it] rel[ies] upon the opinion of a qualified expert advisor").

Additionally, the QRE LPA provided so-called "safe harbors" for actions taken by QRE's general partner or its affiliates. Section 7.9(a) of the QRE LPA created four relevant safe harbors. Those four safe harbors were a transaction that was: (i) approved by Special Approval[17]; (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).  Finally, Section 7.10(b) of the QRE LPA states that "[t]he General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the advice or opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such advice or opinion."[18]

The QRE LPA defines "good faith" as requiring the person to believe "that the determination or other action is in the best interests of the Partnership."[19] Significantly, Delaware law holds that the test for "good faith" is subjective, satisfied "if the actor subjectively believes that it is in the best interests of [the partnership]."  *Allen v. Encore Energy Partners, L.P.*, 72

---

[17] Bilek Decl., Ex. 6 (QRE LPA, Section 7.9(a), defining "Special Approval" as "approval by a majority of the Conflicts Committee.")

[18] *Id.* at Section 7.10(b)).

[19] *Id.* at Section 7.9(b)).

A.3d 93, 104 (Del. 2013).   In *Allen*, the "Delaware Supreme Court admonished that '[t]rial judges should avoid replacing the actual directors with hypothetical reasonable people." *Allen v. El Paso Pipeline GP Company, LLC, et al.*, 113 A.3d 176, 178 (Del. Ch. 2014) (quoting *Allen v. Encore Energy Partners, L.P.*, 72 A.3d at 107.   Moreover, with respect to "best interests of the Partnership," Delaware law is clear that the "contractual standard . . . departs from the fiduciary standard of conduct that applies in the corporate arena and which would apply by default absent the contractual modification or elimination of fiduciary duties in an alternative entity agreement." *Allen v. El Paso Pipeline GP Company, LLC, et al.*, 113 A.3d at 179.

Based upon the foregoing, Defendants would have argued that Plaintiffs could not proffer evidence that the Conflicts Committee did not subjectively think that the transaction was in the best interests of QRE's unaffiliated unitholders and that the QRE GP Board did not subjectively think that the transaction was in the best interests of the Partnership.   *See Encore Energy,* 72 A.3d at 109 ("showing that the Conflict Committee members may have negotiated poorly does not permit a reasonable inference that they subjectively believed they were acting against [the Partnership's] best interests").[20]

Additionally, whether or not the Merger consideration sufficiently valued QRE was likewise a complex matter and there was substantial evidentiary support for Defendants' argument that the Board's decision to accept Breitburn's offer was fully defensible.   In any event, based on the extensive public and confidential financial information produced, Plaintiffs' valuation expert determined he would have had difficulty demonstrating that the Merger

---

[20] To the extent the Court would interpret that the QRE LPA did not extinguish all fiduciary duties, the Board would clearly rely on the proper execution and application of its business judgment.

consideration fell outside the range of fairness. Specifically, Mr. Morris explains in his Declaration:

> When the Merger was announced in late July 2014, the WTI [West Texas Intermediate, the most common grade of oil in the U.S. for price benchmarking and quotations] oil price was over $100 per barrel. By the time the Merger closed in mid-November of the same year, the price for oil had plunged to around $75 per barrel and has since declined to around $45 per barrel. The Merger provided both companies with a larger resource and capital base to be able to withstand this pricing shock. In 2015 alone, several oil & gas companies have filed for bankruptcy, including Milagro Oil & Gas, Sabine Oil & Gas Corp, Quicksilver Resources, Saratoga Resources, BPZ Resources, Dune Energy and American Eagle Energy Corp. Left to stand on its own, it is unclear whether QR Energy would have been able to withstand similar pressures given its relatively high debt load (4.3x EBITDA) versus Breitburn's lower relative debt load (3.0x EBITDA)."[21]

Ultimately, based on these facts, the review and analysis of the valuation analyses prepared by the Financial Advisers which were summarized in the Registration Statement and set forth more fully in confidential presentations made to the Board and Conflicts Committee, and the testimony of the bases and assumptions of the Financial Advisors' opinions, Mr. Morris concluded the following with respect to valuation:

> Even before the decline in oil prices, after reviewing documents and information and preparing several financial analyses using accepted valuation techniques and methods, I could not conclude the Merger consideration fell clearly outside of a reasonable range. I based this conclusion on a number of valuation procedures, including my own comparable companies analyses of both QR Energy and Breitburn. . . . However, the disclosure items described above could reasonably have caused QR Energy unitholders to question whether the Merger consideration represented a full price for their units. Taking this into account as well as the sharp decline in oil prices prior to the Merger's ultimate consummation, I believe the Merger conveyed adequate value to QR Energy's unitholders.[22]

---

[21] Morris Decl., ¶¶38, 39.

[22] Morris Decl., ¶¶ 41, 43.

Thus, even if Plaintiffs were able to persuade the Court that there was some deficiency in the process that led to the Merger Agreement or that the Board otherwise breached their QRE LPA by agreeing to the Merger, Plaintiffs could not realistically expect to recover a monetary judgment in favor of the Class since there was little if any evidence that the consideration being proffered to QRE unitholders was unfair. *See In re Wm. Wrigley Jr. Co. S'holders Litig.*, No. 3750-VCL, 2009 Del. Ch. LEXIS 12, at *18-23 (Del. Ch. Jan. 22, 2009) (approving a disclosure settlement as fair and reasonable despite the absence of a monetary benefit when the challenged transaction appeared to be fully and fairly priced). Moreover, no rival bidder emerged at the time of the Settlement, making the prospect of securing an injunction (on grounds other than disclosure) slim. *See, e.g.*, *In re El Paso Corp. S'holders Litig.*, 41 A.3d 432, 449-52 (Del. Ch. 2012).

### b.    The Disclosure Claims

Once it became evident that litigating post-close for breach of the QRE LPA or money damages based upon insufficient price was likely futile, Plaintiffs focused their litigation efforts on securing full disclosure of all material information through injunctive relief. To that end, vigorous and arm's-length negotiations between counsel for the Parties ensued, which produced additional material disclosures ahead of the Merger, ensured that QRE unitholders were equipped to make an informed vote, and which substantially resolved the disclosure contentions Plaintiffs alleged in the Amended Complaint. *See Staples,* 792 A.2d at 960 (recognizing that stockholders have a "right to receive fair disclosure of the material facts necessary to cast a fully informed vote[.] These Supplemental Disclosures and the benefits they provided to the Settlement Class are set forth below.

i.     **Material Information Regarding Greenhill and TPH's Financial Analyses**

During the course of formulating, executing, and consummating the Merger, the QRE GP Board retained two separate financial advisors. To evaluate and design a process to initiate discussions and evaluations with potential candidates regarding a strategic transaction, on April 10, 2014, the QRE GP Board officially retained RBC Capital Markets, LLC ("RBC"), which had acted as QRE's financial advisor on various matters for several years and had extensive knowledge of the QRE business and assets. (Registration Statement at 52). In addition, on April 10, 2014, the QRE GP Board officially retained Greenhill, to evaluate the transaction and, if appropriate, render a fairness opinion. The QRE GP Board retained Greenhill due to it not having "any prior material relationship" with QRE. (Registration Statement at 52). The Conflicts Committee retained its own financial advisor, TPH, to evaluate any potential transaction that was presented to the Conflicts Committee by the QRE GP Board. (Registration Statement at 54).

Plaintiffs obtained through the Supplemental Disclosures material information regarding Greenhill and TPH's financial analyses of QRE and Breitburn. As the Court of Chancery has previously recognized:

> [W]hen a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Only providing some of that information is insufficient to fulfill the duty of providing a 'fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the [] board as to how to vote . . . rely.'

*In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 202 (Del. Ch. 2007). Thus, it is axiomatic that key inputs and assumptions Greenhill and TPH used in their analyses are material and should be disclosed to QRE unitholders. *See, e.g., In re Pure Res., Inc., S'holders Litig.*, 808

18

A2d 421, 449 (Del. Ch. 2002) (finding that stockholders are entitled to a "fair summary" of the investment bankers' work); *David P. Simonetti Rollover IRA v. Margolis*, 2008 Del. Ch. LEXIS 78 at *30 (Del. Ch. June 27, 2008) ("The key assumptions made by a banker in formulating his opinion are of paramount importance to the stockholders because any valuation analysis is heavily dependent upon the projections utilized. A proxy statement should 'give the stockholders the best estimate of the company's future cash flows as of the time the board approved the [transaction].'") (quoting *Netsmart*, 924 A.2d at 203); Transcript of Settlement Hearing at 43:6-15, *Turberg v. ArcSight*, No. 5821-VCL (Del. Ch. Sept. 20, 2011) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be in there . . . [Y]ou would never see a board book that would go to the board without the background multiples.").[23]

Indeed, is well-settled under Delaware law that when a disclosure document "ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts." *In re Pure Res.*, 808 A.2d at 448; *see also In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76-77 (Del. Ch. 2007) (financial advisor's changes to valuation were not explained and the proxy statement was therefore materially misleading); *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1177-78 (Del. Ch. 2010) ("Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion. . . . [B]ecause the failure to describe what the banker actually came up with . . . the proxy statement presents a range that suggests that the merger price is far more attractive. . . .").

The Supplemental Disclosures provided material information that was missing from the disclosures initially provided in the Registration Statement with respect to QRE's advisors'

---

[23] Bilek Decl., Ex. 7.

19

financial analyses that provided the basis for their fairness opinions.   This information was necessary for unitholders to receive a fair summary of the advisors' work and to understand the basis of their various analyses.   Without disclosure of this information, the Financial Advisors' analyses were materially misleading and incomplete.

### TPH'S NET ASSET VALUE AND DISCOUNTED CASH FLOW ANALYSES

Contained in the Supplemental Disclosures was clarifying information regarding the *Net Asset Value*[24] Analysis performed by TPH.   Specifically, the Supplemental Disclosures informed QRE unitholders that TPH also considered a combined 3P[25] risking percentage provided by QRE management of approximately 82% for QRE's reserves in performing its analysis.   To an MLP like QRE, the energy reserves are a critical financial metric since the reserves are the basic source of revenue for the Partnership.   The inclusion of the 3P risking percentage allowed unitholders to analyze a key value driving input to TPH's analysis, based on QRE management's expectations as to the riskiness of the reserves, that directly affected the cash flows expected to be generated from the reserves.   Because of this disclosure unitholders understood for the first time that QRE management had essentially discounted the projected revenue and cash flow

---

[24] TPH's *Net Asset Value* Analysis calculated the present value of the after-tax future cash flows that QRE could be expected to generate from its existing base of estimated proved reserves, probable reserves and possible reserves as of March 31, 2014, as provided by the management of QRE and is akin to a discounted cash flow analysis which is considered to be one of the more important valuation analyses because it values a Company's intrinsic worth.   *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 925 (Del. Ch. 1999).   In transactional cases such as this, courts routinely find the DCF, driven by management's financial projections, to be the most reliable indicator of value of a company's stock on the date of a merger transaction. *See, e.g., In Re Toys "R" Us, Inc. Shareholder Litigation*, 877 A.2d 975, 1013 ("a DCF model [] is the model most consistent with what the Company's stockholders would receive in an appraisal"); *ONTI,* 751 A.2d 904, 925 ("this court favors the discounted cash flow approach").

[25] 3P is shorthand for proved, probable and possible, which are the three primary classifications of oil & gas reserves.   These classifications represent a spectrum of risk, where proved reserves are least risk and possible reserves are most risky.

stream expected from there energy reserves by 18%.  This permitted unitholders to fully assess the appropriateness of the foundation of the most important valuation analyses.  *See In re BioClinica, Inc. S'holder Litig.*, Consol. C.A. No. 8272-VCG, 2013 Del. Ch. LEXIS 52, at *18 (Del. Ch. Feb. 25, 2013) ("Generally, the failure of a company to disclose management's financial projections in its proxy materials, when those projections have been relied on by a financial advisor to render a fairness opinion, is a material omission that will sustain injunctive relief if not corrected.")  Also, additional details relating to specific parts of the Net Asset Value Analysis were disclosed, several of which were large relative to the overall value of the Merger consideration.[26]

As part of the Supplemental Disclosures, unitholders were also informed that for the purposes of TPH's *Discounted Cash Flow Analysis*[27], cash flow was defined as "EBITDA[28] less capital expenditures (pre-tax)."  This provided important context in understanding the work performed by TPH as part of its *Discounted Cash Flow Analysis*.  Although some in the energy industry use EBITDA minus capital expenditures as a shorthand estimate of cash flow, the actual expression for cash flow also considers changes in working capital and tax obligations.  As such, the relevance of this analysis could be better evaluated in light of this information.[29]

### TPH'S CONTRIBUTION ANALYSIS

Correction to the Disclosed Range of Implied Exchange Ratios

---

[26] Morris Decl., ¶14.

[27] TPH performed a *Discounted Cash Flow Analysis* of QRE using reserve reports and financial forecasts through 2017 as provided by QRE.  *See footnote 3 Supra* (setting forth cases emphasizing the importance placed on the DCF analysis for valuation purposes).

[28] EBITDA refers to earnings before interest, taxes, depreciation and amortization, which is a common measure of accounting profit in this industry.

[29] Morris Decl., ¶15.

As part of the Supplemental Disclosures, unitholders were provided with important detail regarding the *Contribution Analysis* performed by TPH.   Specifically, the percentage contributions from QRE and Breitburn, respectively, and the implied exchange ratios were disclosed for each of 19 separate metrics evaluated by TPH.   This Supplemental Disclosure replaced the third full paragraph on page 83 of the Registration Statement, which previously stated that this analysis "implied a range of exchange ratios from 0.3652x to 1.2498x." However, this statement required significant clarification to avoid being misleading.   The low end of the initially quoted range (0.3652x) was developed by TPH using "the 10-year average commodity price scenario" and differed starkly from the low end of the range (0.7132x) when using QRE management's energy price deck,[30] as shown in the table of implied exchange ratios ultimately disclosed.   The Merger exchange ratio was 0.9856x, which fell significantly closer to the range of 0.7132x to 1.2498x than it did to the lower range of 0.3652x to 1.2498x that was initially described in the Registration Statement.   But-for this Supplemental Disclosure, the prior description of this analysis would have led one to believe QRE was getting an exceptionally favorable exchange ratio, which was not the case when evaluated using updated pricing expectations for oil and gas.[31]

Moreover, both the QRE GP Board and the Conflicts Committee touted their "belief that the aggregate interest of QRE common unitholders in the combined entity would be greater than the portion of the combined entity's distributable cash flow in 2015 and 2016 and net asset value brought to the combined entity by QRE" in making their determination and approval of the Merger. (*See* Registration Statement at 62, 66).   However, the Registration Statement omitted the

---

[30] A price deck is a term used to describe the forecast commodity prices for oil and gas used in projecting future revenue and profits from exploration and production activities.

[31] Morris Decl., ¶¶16-17.

implied exchange ratio of the relative contributions of QRE and Breitburn's 2015 and 2016 estimated distributable cash flow.  The Supplemental Disclosures remedied this omission and armed with the newly disclosed information for TPH's *Contribution Analysis*, QRE unitholders could compare the implied exchange ratio of the relative contributions of QRE and Breitburn's 2015 and 2016 estimated distributable cash flow of 0.8834x and 0.9192x against the exchange ratio in the Merger of 0.9586x and against the implied exchange ratios of the other financial metrics evaluated by TPH.  *See, e.g., In re Copano Energy, L.L.C. Shareholder Litigation*, C.A. No. 8284-VCN, at 11-14, 32 (Del. Ch. September 9, 2013) (TRANSCRIPT)[32] (finding disclosures relating to, among other things, analysis of the distributable cash flows of master limited partnerships to "[a]s a matter of law and fact, . . . materially enhance[] the unitholders' knowledge about the merger . . . [t]hat is a material benefit . . . support[ing] the settlement."

<u>Clarity on Differences in Performance Between QRE and Breitburn</u>

Disclosing the individual contributions for the various metrics evaluated by TPH also added important clarity to understanding the ways in which QRE and Breitburn were each expected to contribute to the combined company.  These individual contribution percentages and their respective exchange ratios demonstrated different levels of performance between QRE and Breitburn that were important to consider.  Whereas Breitburn was expected to contribute approximately 65% to 68% of production in years 2013 through 2016, it was only expected to contribute between 57% and 68% of discounted cash flow and EBITDA for the same years.  This indicated Breitburn was expected to convert its production to cash flow less efficiently than QRE.[33]

---

[32] Bilek Decl., Ex. 8.

[33] Morris Decl., ¶¶18-19.

Additionally, there are several metrics whose implied exchange ratios were at or above the Merger exchange ratio. Most notably, the 1P Reserves – Modeled as well as 2013A DCF and EBITDA demonstrated exchange ratios of 1.0373x, 1.1021x, and 1.2498x, respectively. Each of these was above the actual Merger exchange ratio of 0.9856x.[34]

<u>Clarity on QRE's Proved Reserves</u>

The additional disclosures of the percentage contribution of QRE and Breitburn also brought to light a clear divergence between QRE's reported 1P reserves ("Proved Reserves") and its modeled reserves. Whereas the implied exchange ratio based on QRE's reported Proved Reserves was 0.7132x, the implied exchange ratio based on QRE's modeled Proved Reserves was 1.0373x, well above the Merger exchange ratio of 0.9856x. The comparison demonstrated QRE management's internal expectations were at odds with what was being represented to the market. The modeled reserves and the reported reserves appeared to present two very different pictures about QRE. Without this disclosure, the only avenue for calculating an implied exchange ratio using reserves would have been to use reported reserves, which would have resulted in an implied exchange ratio of only 0.7132x. This falls well below the actual exchange ratio of 0.9856x and presented the Merger in a favorable light from a valuation perspective. However, using modeled reserves, the implied exchange ratio was 1.0373x, which was above the actual exchange ratio and had the opposite effect.[35]

**TPH'S SELECT PUBLIC COMPANY TRADING STATISTICS ANALYSIS**

As part of the Supplemental Disclosures, important information was provided concerning the observed multiples and selected companies reviewed by TPH in its *Select Public Company Trading Statistics Analysis*. This analysis measured certain financial, operating and stock market

---

[34] Morris Decl., ¶20.
[35] Morris Decl., ¶¶21-22.

information pertaining to the Partnership with corresponding information from nine similar publicly traded MLPs focused on the upstream oil and gas industry.  The selected public comparables analysis is a market approach to valuation, "The market approach to valuation is relevant because it uses observable factual evidence of actual sales of other properties to derive indications of value."[36]  Specifically, the actual comparative metrics, *i.e.*, EV/ 2014E EBITDAX, EV/ 2015E EBITDAX, EV/ Proved Reserves ($/Boe), EV/ Current Production ($/Boe/d), EV/ 2014E Production ($/Boe/d), and EV/ Proved Reserves PV-10, were disclosed for the first time for each of the selected companies.  Not only did this information provide greater context as to how QRE compared to its public peers, but it also provided a more complete picture of the work done by TPH.  A selected public comparables analysis is one of the three primary valuation analyses typically performed as part of the valuation process for a company, with the other two analyses being a precedent transactions analysis and a discounted cash flow analysis.  This type of analysis uses multiples and a comparative benchmarking process described above for publicly-traded "peers" as a basis of valuation.  No two companies are identical, so it is important to undertake this benchmarking process as there are certain companies that will be more similar to the valuation subject than others.[37]

The benchmarking information helped illustrate which of the selected companies were *most* comparable to QRE based on yield, performance, value of reserves and production, as well as the quality of reserves.  Being more comparable to QRE, these companies are more important in valuing QRE as opposed to the range or median of all of the comparable companies.[38]

---

[36] Pratt, Shannon P. *The Market Approach to Valuing Businesses*. 2nd ed. Hoboken: John Wiley & Sons, 2005: xxxii.

[37] Morris Decl., ¶¶23-24.

[38] Morris Decl., ¶25.

The disclosure of individual reserve values per barrel of oil equivalent as well as the disclosure of value of current and 2014 expected production demonstrated QRE was markedly above-average relative to its peers.  In terms of value of current and 2014 expected production, QRE was the second highest company amongst the comparable companies.  Without the disclosure of the metrics for each of the individual companies, unitholders may not have appreciated QRE's superior production characteristics.[39]

Generally, the disclosure of multiples is material to shareholders because comparable company analyses are market-based valuation techniques, which are "built upon the premise that similar companies provide a highly relevant reference point for valuing a given target."[40]  In other words, these analyses are based on company comparability, and the more similar selected companies are to the subject company, the more reliable the imputed valuation should be.  To this end, the Delaware Court of Chancery has stated that:

> The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison.  At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes.

*In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991); *see also Prescott Grp. Small Cap, L.P. v. Coleman Co.*, 2004 Del. Ch. LEXIS 131, at *81-82 (Del. Ch. Sept. 8, 2004) (rejecting comparable company analysis in an appraisal action where "none of [the defendant's expert's] 'comparables' was truly comparable to [the subject company] in any meaningful sense, and none of them had economics similar to [the subject company's]"); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 477 (Del. Ch. 2011) (rejecting comparable companies analysis

---

[39] Morris Decl., ¶26.
[40] Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers and Acquisitions*, 113 (2d ed. 2013).

where the court "lack[ed] sufficient confidence in the comparability of the selected companies").

Consequently, an enhanced understanding of the various comparable companies, as well as their respective market valuations, is material to shareholders in evaluating the resulting indications of value derived by a board's financial advisor. *See Turberg v. ArcSight*, C.A. No. 5821-VCL, at 43 (Del. Ch. Sept. 20, 2011) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be in there, just like they're in there when you give them to the board. . . .  [Y]ou would never see a board book that would go to the board without the background multiples."); *In re Celera Corp. S'holder Litig.*, 2012 Del. Ch. LEXIS 66, at *122 (Del. Ch. Mar. 23, 2012), *rev'd in part on other grounds*, 2012 Del. LEXIS 658 (Del. Dec. 27, 2012) ("[A] fair summary of a comparable companies or transactions analysis probably should disclose the market multiples derived for the comparable companies or transactions.").

Similarly, the disclosure of individual metrics provided unitholders with enough context to determine the companies most comparable to QRE after performing a benchmarking analysis. Based on superior growth, similar margins and reserve composition, two companies, LRR Energy and Mid-Con Energy Partners, stood out as most comparable to QRE.  These companies had average or above average value per production as well as above average value per proved reserves.  This reinforced the notion that QRE's valuation should be above average values relative to the peer group as a whole.[41]

Because TPH did not actually select and apply multiples in this analysis as is customary, this left unanswered questions about how TPH's opinion was based on this market information.

---

[41] Morris Decl., ¶27.

The disclosure of the individual multiples and metrics provided enough detail to help evaluate QRE against its peers in evaluating the sufficiency of the Merger consideration.[42]

### TPH'S SELECT CORPORATE TRANSACTION STATISTICS ANALYSIS

TPH performed a Select Corporate Transaction Statistics Analysis which identified seven corporate transactions involving upstream energy entities and conducted an analysis to assess how similar transactions were valued.  As part of the Supplemental Disclosures, unitholders were for the first time provided with additional detail on the metrics of each of the seven companies involved in the selected transactions, including reserves, production, and transaction multiples of target companies from transactions reviewed by TPH. Specifically, TV/ Proved Reserves ($/Boe), TV/ Current Production ($/Boe/d), and TV/ 2015E EBITDAX were disclosed for each of the transaction comparables.  This information was important because it provided a better understanding of the scope of work performed by TPH in arriving at its fairness opinion.  As described above, a precedent transactions analysis is one of the three primary valuation analyses typically performed by financial advisors.  Like the *Selected Company Trading Statistics Analysis*, the *Select Corporate Transaction Analysis* TPH performed is a market approach to valuation, "The basic principles of the transaction method are the same as for the guideline publicly traded company method.  The differences in implementation are a result of the differences in data available and, in some cases, the structure of the transactions."[43]

In the case of a "precedent transaction" analysis such as this one, the financial advisor typically reviews observable transaction metrics, including valuation multiples and the characteristics of the comparable target companies, in order to determine an appropriate multiple to value the subject company.  Much like with a comparable companies analysis, no two target

---

[42] Morris Decl., ¶28.
[43] Morris Decl., ¶¶29-30.

companies in a precedent transactions analysis will be identical. As such, it is important to also review benchmarking metrics for transactions to determine which transactions are the most relevant. By far, the most recent transaction in the set of transaction comparables was Whiting's acquisition of Kodiak Oil and Gas Corp. This transaction demonstrated the highest valuation of proved reserves and current production of any of the transactions reviewed. This disclosure provided context to unitholders as to the valuations being paid most recently in comparable transactions.[44]

Similarly to its *Select Public Company Trading Statistics Analysis*, TPH did not select and apply multiples to estimate values for QRE. As such, the individual multiples and metrics provided as part of this Supplemental Disclosure provided important context.[45] Notably, this disclosure revealed that QRE's proved reserves and current production values were most similar to the Pioneer Natural Resources Company acquisition of Pioneer Southwest Energy Partners L.P. in 2013 as well as the SandRidge Energy Inc. acquisition of Arena Resources, Inc. in 2010, which had transaction value to 2015E EBITDAX multiples of 11.9x and 10.8x, respectively. The disclosure allowed unitholders to identify this relationship and evaluate whether the multiple being received by QRE was appropriate based on QRE's comparability to the specific transactions included as part of this analysis.[46]

**GREENHILL FAIRNESS PRESENTATION**

As part of the Supplemental Disclosures, unitholders were informed that estimates of proved, probable and possible reserves provided to Greenhill had a "combined 3P risking

---

[44] Morris Decl., ¶¶31-33.
[45] *See Turberg*, C.A. No. 5821-VCL, at 43; *Celera*, 2012 Del. Ch. LEXIS 66, at *122 ("[A] fair summary of a comparable . . . transactions analysis probably should disclose the market multiples derived for the comparable [] transactions.").
[46] Morris Decl., ¶34.

percentage provided by QRE management of approximately 82% for QRE's reserves." The risking percentage represented QRE management's expectations as to the riskiness of its reserves, which is important in their valuation. The risk adjustment (in this case an 18% value reduction across the board) applied to reserves is a substantial driver of value because it directly affected the cash flows expected to be generated from the reserves. The discount rate used in valuing reserves, expressed as a required rate of return, also embodies risk of successfully developing the reserves. Accordingly, knowing the risking percentage also applied to the 3P reserves was important to determine whether risks to the reserves were double-counted.[47]

As part of the Supplemental Disclosures, unitholders were also provided with additional detail around Greenhill's calculated pro forma impact of the Merger. Specifically, unitholders were provided with expected pro forma impact for Breitburn and QRE of 2015-2016 Distributable Cash Flow, Distribution per Unit, and Distribution per Unit Coverage. The disclosures demonstrated a changing dynamic at QRE, with the Partnership transitioning from funding growth to more stabilized operations that allowed for higher distributions available to unitholders. However, this analysis indicated the combined company was expected to increase its coverage ratio,[48] which would limit growth in future distributions. Put another way, Breitburn was going to be able to increase its coverage ratio as a result of the Merger due to the contribution of cash flow being made by QRE.[49]

In sum, and as Mr. Morris concluded:

---

[47] Morris Decl., ¶¶10-11.

[48] Coverage ratio is defined as the ratio of distributable cash flow to the cash flow actually distributed (Distributable Cash Flow / Actual Distribution), and is a measure of the "safety net" a company provides itself in reserving cash to fund operations as opposed to distributing cash.

[49] Morris Decl., ¶13.

While the quantitative value of the information contained in the Supplemental Disclosures is not readily ascertainable, this information plays a meaningful role in investment decisions.  Individually and collectively, the financial disclosures described herein were essential to understanding the financial analyses prepared by the Financial Advisors.  As such, they represented a substantial benefit to QR Energy's unitholders in their evaluation of the Merger and the consideration it offered.  For the reasons described above, it is my opinion the financial information embodied by the Supplemental Disclosures provided QR Energy's unitholders with important and valuable information in evaluating the proposed Merger.  Moreover, since the Merger consideration consisted of Breitburn units, which would incorporate QR Energy's valuation post-close, the Supplemental Disclosures also provided important information relating to the valuation of the combined entity that is possible once the Merger is consummated.[50]

### ii.    The process and negotiations between QRE and Breitburn leading up to the signing of the Merger Agreement

Delaware courts have held that "once defendants traveled down the road of partial disclosure of the history leading up to [a merger] . . . , they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."  *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994).

The Supplemental Disclosures provided unitholders with additional information regarding the background, process, and price negotiations with respect to the Merger. Specifically, the Supplemental Disclosures provide more information regarding (i) QRE management and Board discussions relating to strategic alternatives and related discussions with financial advisors; (ii) information relating to the process of selecting and retaining the financial advisors for the Merger; (iii) disclosure relating to the evaluation of transaction structure as it related to taxable benefits for QRE unitholders; and (iv) information regarding the decision not to extend an invitation to the second round of the sale process to a potential bidder by RBC and Greenhill.  As a result, QRE unitholders were able to more fully understand the process

---

[50] Morris Decl., ¶¶44-45.

undertaken by the Board, the Conflict Committee, and their advisors resulting in the transaction with Breitburn and, thus, were necessary to provide QRE unitholders with a full and fair characterization of the events leading up to the Merger.

     **5.**     **The Opinion of Plaintiffs' Counsel and Settlement Class Members**

It is well settled that the reaction of the Class to the Settlement is perhaps the most significant factor to be weighed in considering its adequacy. *See Quintanilla v. A & R Demolition Inc.*, No. H-04-1965, 2008 U.S. Dist. LEXIS 37449, at *15 (S.D. Tex. May 7, 2008) ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement'") (quoting *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 118 (2d. Cir. 2005)).

In this case, after receiving notice of the Settlement, only one Class member has objected to the Settlement as of the time that Plaintiffs' Counsel filed this Motion.  On June 23, 2015, an objection to the proposed settlement and plaintiff's motion for attorneys' fees was filed by Irwin Berlin ("the Objection").

While, as discussed below, the Objection is baseless in every respect, it's mere existence is especially egregious *since Mr. Berlin is a party to the Settlement and knowingly entered into the Stipulation as a settling party on April 27, 2015* after fully participating in the litigation (through his counsel Finkelstein & Thompson, LLP, who filed the Objection on Mr. Berlin's behalf) from its inception almost a year ago.  Mr. Berlin, through his counsel: (i) drafted and revised pleadings and motions; (ii) had  regular communications with and full access to all other plaintiffs' counsel in the litigation; (iii) had access to all merits and confirmatory discovery (including attendance and participation at depositions) and plaintiffs' financial expert; (iv) authorized the execution of the Stipulation and exhibits after reviewing and commenting on their

content; (v) authorized the agreed-to fee after participating in real-time communications concerning fee negotiations with Defendants; and (vi) drafted and finalized the motion for preliminary approval and supporting papers filed on April 27, 2015.  In short, Mr. Berlin is a party to this Settlement, and through his counsel's informed authorization of the Stipulation approved the Settlement as fair, reasonable and adequate and authorized the amount of attorney's fees agreed to as part of the Settlement.  On this basis alone the Objection should be denied.

In the event the Court considers its substance, the Objection fares no better, especially in light of Mr. Berlin's familiarity with (and apparent disregard of) the factual and evidentiary record established during the litigation.  The Objection attempts to make three arguments concerning the fairness of the Settlement: (i) that the Settlement "fails to correct the inadequate offer price to QRE's public unitholders"  (ii) that the Court should establish an "opt-out right" to allow QRE unitholders to pursue "claims for damages and other forms of particularized relief," and (iii) the Supplemental Disclosures have conferred "minimal" benefit and cannot act as consideration for the Settlement and basis for an award of attorneys' fees, and as such an award of attorneys' fees should be reduced or denied.[51]  Each of these arguments lacks any factual or legal foundation.

### a.  The Supplemental Disclosures Provided Valuable Benefits to the Class

Pursuant to the Settlement, QRE agreed to disclose additional material information to unitholders concerning the Company and the Transaction in Form 8-K filed with the SEC on November 10, 2014. *See supra* at Section III.  This included, as described in Section IV.B.b.i-ii, (i) material information concerning QRE management's risk adjustments to its energy reserves,

---

[51] *See generally*, Objection to Proposed Settlement and Plaintiffs' Motion for Attorneys' Fees By Plaintiff QR Energy LP Unitholder Irwin Berlin (hereinafter "Objection").

one of the most important internal financial metrics relied upon in assessing standalone value of energy MLPs; (ii) material information and correlated analyses concerning the exchange ratios implied by TPH's *Contribution Analysis*; (iii) material information concerning the distributable cash flows QRE unitholders could expect as result of the Merger; and (iv) material information concerning the process leading to the execution of the Merger Agreement.

As explained by Mr. Morris, "Individually and collectively, the financial disclosures [described below] were essential to understanding the financial analyses prepared by the Financial Advisors [Greenhill and TPH].  As such, they represented a substantial benefit to QR Energy's unitholders in their evaluation of the Merger and the consideration it offered."[52]

The Objection presents no analysis of the substance or materiality of the Supplemental Disclosures, only stating (incorrectly) that they failed to "introduce a new topic of disclosure or correct some alleged prior misstatement,"[53] provided only "additional background to topics already disclosed,"[54] and failed to "change the financial terms" or "increase the purchase price paid" to QR unitholders."[55]

This argument misses the point, betrays a fundamental misunderstanding of the law, and disregards the importance of shareholder suffrage. When asked to vote on a proposed merger transaction, shareholders have "the right to receive fair disclosure of the material facts necessary to cast a fully informed vote." *Staples*, 792 A.2d at 960.  If disclosure documents have omitted material

---

[52] Morris Decl., ¶44.

[53] Objection at ¶25.

[54] *Id.*

[55] *Id.*, at ¶¶21, 24

information, curative disclosures can protect that right "in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable." *Id.*

Although informational benefits do not increase the merger consideration, they can empower shareholders "to think for themselves on full information, thereby vindicating their rights as stockholders to make important voting and remedial decisions based on their own economic self-interest." *Netsmart,* 924 A.2d at 207.  The timely disclosure of additional material information can be of "greater value to the class than any potential award of damages based on the failure to disclose the same information, as such information is of the greatest utility when it is available." *In re Talley Indus., Inc. S'holders Litig.*, No. 15961, 1998 Del. Ch. LEXIS 53, at *46 (Del. Ch. Apr. 13, 1998). Here, by providing additional information concerning the Financial Advisor's valuation analyses and QRE's financial condition, QRE's unitholders were in a better position to evaluate the adequacy of the consideration and ultimately vote down the Merger if they believed it was unfair.

Rather than engage in any real analysis or address the benefits achieved through this litigation, the Objection generally disparages disclosure settlements and cherry picks a handful of cases in which, based upon the necessarily particularized context in which a court necessarily considers such matters, rejected settlements or award of attorneys' fees.[56]  The benefits achieved in this litigation, however, must be examined on their own merits in the context of the facts and circumstances presented.  This analysis has been fully and specifically set out above and below, and undeniably supports the fairness, reasonableness and adequacy of the Settlement and award of full attorneys' fees.

---

[56] *Gordon v. Verizon Communications Inc.*, 2014 N.Y. Misc. LEXIS 5642, a *11 (N.Y. Sup. Ct. Dec. 19, 2014); *City Trading Fund v. Nye*, 2015 N.Y. Misc. LEXIS 11, at * 32, *41 (N.Y. Sup. Ct. Jan. 7, 2015).

What is particularly odd about the Objection's opposition to disclosure settlements and the level of attorneys' fees sought is that Mr. Berlin was recently a named plaintiff in a strikingly similar lawsuit challenging the merger of two energy MLPs that was resolved for supplemental disclosures with no additional compensation for unitholders. *See In re Copano*, C.A. No. 8284-VCN (Del. Ch. Sept. 9, 2013). *Copano* involved similar supplemental disclosures, including distributable cash flows and public company analysis multiples. The disclosures were found by the Court to be material, sufficient to support fairness of the settlement and an award of $450,000 in attorneys' fees and expenses.[57]  It is curious why Mr. Berlin would object to benefits achieved and fees sought here, when he was a willing participant in an identical settlement in *Copano*.

### b.  The Merger Consideration Was Not Inadequate

The principal source of Mr. Berlin's discontent appears to be a belief that his units of QRE were worth more than was being offered in the Merger.  This a common refrain from investors who believe their investments have a higher valuation then the market or internal valuation analyses indicate.  So it is goes with Mr. Berlin, who repeatedly complains that the Settlement failed to correct or increase the inadequate price or did not result in a higher price being paid to QR Energy unitholders.

Yet the Objection fails to analyze or even acknowledge (i) Greenhill and TPH's multitude of valuation analyses that measured the fairness of the Merger Consideration to QRE unitholders from various perspectives, all of which imply that the merger consideration QR Energy unitholders received (*i.e.,* 0.9856 units of Breitburn common units, worth at the time of the deal $22.48) was fair from a financial perspective; (ii) the non-public confidential documents and testimony obtained by Plaintiffs during the Action that explored on a deeper basis the work

---

[57] *See* Bilek Decl., Ex. 8

underlying the Financial Advisors' analyses; and (iii) the work Plaintiffs' own financial expert conducted in analyzing and evaluating the Financial Advisors' opinions.

Instead, the Objection relies solely on an "investigation" that purportedly "confirm[s] the price paid by Breitburn was inadequate,"[58] which turns out to consist of eight paragraphs describing public information and commentary from the July 2014 time period cut-and pasted *verbatim* from the Amended Complaint filed in the Action on September 8, 2014.[59]   The Objection ignores the extensive valuation information, both public and private, and falls back on unsupported generalities as the sole basis of claims that the "price paid by Breitburn was inadequate."   What make this even more surprising is throughout most of the nearly twelve months between the occurrence of the public events that comprise his "investigation" and the filing of his Objection, Mr. Berlin, as a named plaintiff and party to the Stipulation and Settlement had full and unfettered access to all of the discovery and Plaintiffs' financial expert Mr. Morris.

In his Declaration, Mr. Morris disputes Mr. Berlin's reliance on "synergies" as a basis to argue that unitholders did not receive adequate consideration.  He states, "[a]rguing for a share of synergies in an all stock merger is irrelevant, financially speaking, as shareholders of both companies proportionally share in synergies, if any, by virtue of their ownership interest in the combined company.  Simply put, a rising tide raises all ships.  To the extent the Merger produces

---

[58] Because this was a unit-for-unit exchange in which QRE unitholders received 0.9856 units of Breitburn common units in exchange for their units, Plaintiffs assume repeated reference to an inadequate "price" actually refers to an allegedly inadequate exchange ratio.

[59] Bilek Decl., Ex. 9 (comparing Mr. Berlin's investigation" with the corresponding paragraphs of the Amended Complaint.)  Thus while the allegations that comprise Mr. Berlin's "investigation" may have been viable when pled, prosecution of those claims has proven them to be difficult if not impossible to establish.

synergies, QR Energy's shareholders will reap the benefit of those synergies by virtue of their holdings in Breitburn."[60]

Moreover, Morris states "[w]hen the Merger was announced in late July 2014, the WTI [West Texas Intermediate, the most common grade of oil in the U.S. for price benchmarking and quotations] oil price was over $100 per barrel.  By the time the Merger closed in mid-November of the same year, the price for oil had plunged to around $75 per barrel and has since declined to around $45 per barrel.  The Merger provided both companies with a larger resource and capital base to be able to withstand this pricing shock.  In 2015 alone, several oil & gas companies have filed for bankruptcy, including Milagro Oil & Gas, Sabine Oil & Gas Corp, Quicksilver Resources, Saratoga Resources, BPZ Resources, Dune Energy and American Eagle Energy Corp.  Left to stand on its own, it is unclear whether QR Energy would have been able to withstand similar pressures given its relatively high debt load (4.3x EBITDA) versus Breitburn's lower relative debt load (3.0x EBITDA)."[61]

In assessing his valuation claim, the starting point for Mr. Berlin should have been a review and analysis of the Financial Advisors' valuation analyses that purportedly support fairness. These are voluminous. First and perhaps most importantly, the Financial Advisors preformed valuation analyses that calculated implied per unit valuation ranges based upon internal projections and other financial information provided by QRE and Breitburn management. These included: (i) *Net Asset Valuation Analyses* (which calculate a per unit valuation range of QRE units based upon the present value of after tax future cash flows that the partnership could be expected to generate from its existing base of estimated proved, probable and possible energy reserves) (Registration Statement at 81); (ii) *Discounted Cash Flow*

---

[60] Morris Decl., ¶¶38-39.
[61] Morris Decl., ¶¶38-39.

*Analyses* (which calculate a per unit valuation range of QRE units based upon the present value of annual free cash flows from QRE financial forecasts through 2017 in conjunction with QRE reserve reports) *Id.*; and *Present Value of Future Unit Price Analyses* (which calculate the per unit valuation range of QRE units based upon a discounted cash flow analysis of projected stand-alone distributions to be received by QRE unitholders using financial forecasts through 2018). *Id.*

All of these analyses, which are generally considered the most reliable and accurate method of measuring a company or partnership's long-term value because they are based upon management's own internal best estimates of current and future performance of a company or partnership, indicated per unit valuation ranges for QRE units *well below* the $22.48 per unit implied value of the total consideration that was to be paid to Partnership unitholders, meaning that on the basis of these analyses  $22.48 was well above what would be considered fair merger consideration for QRE unitholders.

Moreover, both Financial Advisors performed relative valuation analysis which measured the fairness of the Merger to QRE unitholders based upon comparative external metrics.  For example, Greenhill performed a *Comparable Company Analyses* (Registration Statement, at 73-74) which measured certain financial, operating and stock market information pertaining to the Partnership with corresponding information from nine similar publicly traded upstream master limited partnerships in the oil and gas exploration and production sector.  TPH performed a *Select Public Company Trading Statistics Analysis* (Registration Statement, at 83), a similar analysis utilizing information from the same nine similarly-situated MLPs.  TPH performed a *Select Corporate Transaction Statistics Analysis* (Registration Statement, at 86), in which TPH chose seven corporate transactions involving upstream energy entities that satisfied

39

certain criteria and conducted a comparable transactions analysis to assess how similarly transactions were valued.  Again, the Merger Consideration fell well within the comparative transaction multiples and implied per unit value ranges that these analyses yielded.

Finally, the Financial Advisors conducted two other analyses that are particularly important to unitholders evaluating a unit-for-unit master limited partnership merger: *Contribution Analysis,* which measures the fairness of implied exchange ratios, (Registration Statement, at 72-73 and 83) and *Pro Forma Accretion (/Dilution) Analysis,* which quantifies the Merger's anticipated effect on distributable cash flow.  (Registration Statement, at 76, 86).  More specifically, a *Contribution Analysis* analyzes select business metrics of the two merging companies or partnerships and the relative contribution each will make to the ultimate combined entity on a pro forma basis, yielding implied ranges of exchange ratios based upon those metrics.

Whether or not an exchange ratio is fair is perhaps the most important factor when a stockholder or unitholder is evaluating a stock-for-stock or unit-for-unit merger, and the respective *Contribution Analyses* both concluded that QR Energy unitholders receiving 0.9856 units of Breitburn was well within a range of fairness.  *Id.* a 72-73, 78, 86.

Distributable cash flow, and a prospective merger's effect on cash distributions, is another matter of great significance to unitholders evaluating a merger.  Energy MLP's are considered income-oriented investments, and if a merger reduced or diluted cash distributions unitholders tend to disapprove. The respective *Pro Forma Accretion (/Dilution) Analyses* demonstrate that the Merger was expected to be accretive to distributable cash flows (meaning QRE unitholders should expect to see their cash distributions increase due to the pro forma effects of the Merger.[62]

---

[62] *Id.* at 86.

The Objection does not address any of the foregoing.

What the Objection also ignores, as discussed in Section IV B.4a herein, is that Plaintiffs did not simply accept at face value the summary of the Financial Advisors' work that is disclosed in the Registration Statement, but challenged the valuation analyses described above.  A critical aspect of the litigation involved obtaining and analyzing the non-public underlying documents prepared by the Financial Advisors and presented to the QRE Board and Conflicts Committee and, in conjunction with Mr. Morris, determining, among other things,  (i) if the methodologies, assumptions and inputs employed by the Financial Advisors were appropriate and produced reliable analyses, and (ii) whether what is disclosed in the Registration Statement is in fact a fair summary of the work performed and provided all necessary and material information regarding valuation.  *See generally*, Morris Declaration.   Further, Mr. Morris not only tested the methodologies, inputs and assumptions that comprised the Financial Advisors' analyses, he and his staff conducted their own independent analyses based in part on management's internal projections and financial information. Morris Decl. at ¶¶2, 8.  Mr. Berlin engaged in no such challenge, applied no scrutiny to the Financial Advisors' valuation analyses, and thus has no basis for objecting to the adequacy of the Merger Consideration.

Nor does the recent decline in Breitburn's unit prices represent support, empirical or otherwise, that the Settlement "failed to correct the inadequate offer price."   Objection, at ¶1.  Even if post-close financial performance were relevant to whether a Board accepted an unfair price (and it is not), given the recent dramatic deterioration in oil prices it is highly doubtful that QRE and its unitholders would have fared any better rejecting Breitburn's bid and continuing as a standalone entity.  *See* Morris Decl., ¶¶ 38-39.  In fact, as the chart below reflects, the value of the units of all nine of the MLP's selected, observed and analyzed by Greenhill and TPH in their

*Comparable Company Analyses* and *Select Public Company Trading Statistics Analysis* (which are supposed to represent MLP's that most closely resemble QRE) have declined drastically, averaging an *80% drop* since the Merger was agreed to on July 24, 2014, as reflected in the chart included below.

COMPARABLE COMPANY UNIT PRICE DROPS:

| UPSTREAM MLP | CLOSING PRICES: | |
|---|---|---|
| | JULY 24, 2014 | AUGUST 19, 2015 |
| ATLAS RESOURCE PARTNERS, LP | $20.74 | $3.25 |
| EV ENERGY PARTNERS, L.P. | $37.90 | $8.04 |
| LEGACY RESERVES LP | $32.31 | $5.46 |
| LINN ENERGY, LLC | $31.37 | $2.58 |
| LRR ENERGY, L.P. | $19.69 | $3.84 |
| MID-CON ENERGY PARTNERS  LP | $24.16 | $2.52 |
| MEMORIAL PRODUCTION PARTNERS  LP | $23.61 | $6.26 |
| NEW SOURCE ENERGY PARTNERS  LP | $27.38 | $0.55 |
| VANGUARD NATURAL RESOURCES,  LLC | $32.73 | $7.10 |

Even more alarming, other similarly situated MLPs and companies have declared bankruptcy in the past year.  *Id.* at ¶ 39.

Berlin's argument that the Settlement should be rejected on the grounds that Plaintiffs entered into the MOU before conducting any discovery is incorrect on the facts and law. Objection, ¶ 2.  As referenced above, Plaintiffs obtained critical, highly relevant confidential information at the end of October 2014, which was weeks before the parties executed the MOU on November 10, 2014.   Upon receipt of these confidential documents, Plaintiffs' Counsel reviewed, analyzed, and consulted with their financial expert about the impact they would have on Plaintiffs' claims. Only after a thorough review of the documents and consultation with a financial expert did Plaintiffs' Counsel conclude that the best chance of recovery on any of Plaintiffs' claims was the pursuit of material disclosures before the vote on the Merger.

Leaving aside the fact that Plaintiffs conducted discovery before entering into the MOU, none of the cases Berlin cites supports his argument that shareholders challenging a proposed corporate transaction must conduct extensive discovery before entering into a memorandum of understanding.

*In re SS&C Technologies, Inc. Shareholder Litigation*, 911 A.2d 816 (Del. Ch. 2006), involved shareholders' challenge to a management led cash-out merger. Having conducted zero pre-MOU discovery, the court denied the proposed settlement which provided for the issuance of supplemental disclosures, in part,[63] because the publicly available facts "on their face [] raise a series of questions about both [the selling company CEO's] conduct and that of the board of directors." *Id*. at 820. Based on publicly available information, the court reasoned that there were serious unanswered questions about the fairness of the process used to negotiate the cash-out merger, including (i) the CEO of the selling company instigated the transaction without prior board authorization; (ii) the CEO of the selling company identified a transaction where he could realize both a substantial cash payout and the retention of a sizeable investment in the resulting entity; and (iii) when the board finally became involved, its special committee only ran a "brief effort" to identify another potential purchaser and negotiated only a small price increase from the initial proposal. Here, the factual record does not reflect any improprieties in the sales process that were not addressed by the Settlement or that Plaintiffs' Counsel failed to pursue. *Id*.

Additionally, *In re Revlon, Inc. Shareholders Litigation* did not involve the court's consideration of a proposed settlement. *See* 990 A.2d 940 (Del. Ch. 2010). Indeed, Vice

---

[63] The other reason the Court denied the settlement was because it found that plaintiffs "were dilatory in presenting it for approval," including failing to advise the court of the settlement before the "conclusion of the transaction" and plaintiffs' counsel's "striking lack of understanding about basic terms of the transaction" at the final approval hearing. *SS&C*, 911 A.2d at 816-17.

Chancellor Laster of the Delaware Court of Chancery explicitly noted that his "comments on the settlement are necessarily preliminary, because confirmatory discovery has not yet taken place, and the settlement has not been formally presented to me for approval." *Id.* at 942. Leaving aside the fact that *In re Revlon* had nothing to do with the adequacy of a settlement and instead focused on the adequacy of counsel's representation of a proposed class inapplicable to this Action, the court found that class counsel was inadequate where class counsel's "advocacy ha[d] been non-existent," where there were "factual representations in the memorandum of understanding appear inaccurate," and class counsel "readily signed off" on defendants wishes to "amend a non-waivable majority-of-the-minority condition to effect a *de facto* waiver." *Id.* at 942 & 956.

### c.   Certification of an Non Opt-Out Class Is Appropriate

The Objection argues that a mandatory class should not be certified and the Court should establish an opt-out right for QRE unitholders because QRE unitholders should be permitted to "pursue claims for damages or other forms of particularized relief." Objection, ¶¶ 2, 13-14. The certification of a non-opt-out class is appropriate in this Action, as in other merger cases, because, as discussed in Section V-E below, the Class falls within the definitions provided in both Federal Rule of Civil Procedure 23(b)(1) and (b)(2).

The Class meets the requirements of 23(b)(1)(A) because where the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct, a non-opt out class is appropriate. *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 U.S. Dist. LEXIS 136962, at *29-30 (S.D. Ohio Aug. 18, 2009); *see also Bell v. Am. Title Ins. Co.*, 226 Cal. App. 3d 1589, 1604 (1991). The Class also meets the requirements of Rule 23(b)(2), because Plaintiffs: (i) predominantly sought injunctive relief, and (ii) alleged that Defendants acted or

refused to act on grounds generally applicable to the Class as a whole. *Rodriguez v. Countrywide Home Loans, Inc.*, 695 F.3d 360, 365 (5th Cir. 2012); *see also*, *CME Grp. Inc. v. Chicago Bd. Options Exch., Inc.*, No. 2369-VCN, 2009 Del. Ch. LEXIS 109, at *22 (Del. Ch. June 3, 2009) ("actions [such as the present litigation] challenging the exercise of corporate fiduciary duties are frequently certified [on a non-opt out basis]"). A class certified under Rule 23(b)(1) or (b)(2) is mandatory and members of the settlement class *may not* opt out.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011).

Texas Courts have routinely certified non-opt classes in cases, such as this, where plaintiffs challenged a proposed merger transaction and obtained non-monetary benefits on behalf of a company's public shareholders.[64]

The Objector's reliance on *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed. 2d 628 (1985) is misplaced.  The *Shutts* Court explicitly limits its holding requiring opt-outs in federal class actions under Rule 23 to those "wholly or predominantly for money" judgments.  *Id.* at 811, n.3.  As described herein, claims for money damages in the Action did not predominate, in particular once Plaintiffs in conjunction with their expert had fully investigated and analyzed the valuation issues presented.  Under binding 5th Circuit authority, "monetary relief" does not predominate when it is "incidental" to requested injunctive or declaratory relief.  *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998).  Since

---

[64] *See, e.g.,* Bilek Decl., Ex. 10, *In re MetroCorp Bancshares, Inc. S'holders Litig.*, No. 4:13-cv-03198, slip op. (S.D. Tex. Oct. 23, 2014); Bilek Decl., Ex. 11, *In re Crestwood Midstream Partners Unitholder Litig.,* No. 4:13-cv-01528, slip op. (S.D. Tex. May 16, 2014); Bilek Decl., Ex. 12, *In re Pervasive Software, Inc. S'holder Litig.,* No. D-1-GN-12-000352, slip. op. (Travis Cnty. Tex. Nov. 13, 2013); Bilek Decl., Ex. 13, *In re Cornell Cos. S'holder Litig.*, No. 2010-26261, slip op. (Harris Cnty. Tex. Jan. 21, 2011); Bilek Decl., Ex. 14, *In re NATCO Group S'holders Litig.*, No. 2009-35143 (Harris Cnty. Tex. May 21, 2010).

the primary purpose of the Action was to enjoin the Merger for breaches of fiduciary duty (which ultimately evolved into the sole form of relief sought) claims for money damages did not predominate and the Action can be properly certified under Rule 23(b)(2) without permitting opt-outs.

In arguing that a mandatory class should not be certified and the Court should establish an opt-out right for QRE unitholders, the Objection also ignores the Delaware Supreme Court's seminal decision *In re Celera Corp. S'holder Litig.*, 59 A.3d 418 (Del. 2012) (*Celera II),* which explicitly rejects such an approach and applied to the facts presented here supports the certification of the non-opt class in this Action.

In *Celera II*, plaintiff filed a shareholder class action shortly after the target company announced that it had agreed to an all-cash buyout. *Id.* at 425. Following expedited discovery, the parties to the class action reached a settlement that provided for non-monetary benefits, including supplemental disclosures relating to the financial condition of the company. *Id.* at 427.

When plaintiff moved the court for final approval of the settlement following the closing of the buyout, one of the company's largest shareholders (BVF Partners, L.P.) objected and requested that it be allowed to opt-out of the proposed settlement class. *Id.* at 425. The objector had continuously voiced his concerns over the buyout to both the target company and the acquiring company, and it refused to tender its shares. *Id.* Prior to closing, the objector even sent a letter to the acquiring company's CEO, informing him that it would solicit competing bids and would invoke its appraisal rights unless the deal was restructured. *Id.*

In opposing the settlement, the objector argued that it would be "fundamentally unfair" to permit a plaintiff with relatively small holdings to "drag" a larger shareholder, with a large potential damages claim, into a class action and then settle for non-monetary consideration. *Id.* at 435. The

objector also challenged the adequacy and standing of plaintiff as a class representative, as it sold its stock in the target company just days prior to the consummation of the buyout. *Id.* at 428. Nonetheless, the Court of Chancery approved the settlement and certified a non-opt class of the company's public shareholders, and the objector appealed.

On appeal, the Delaware Supreme Court **upheld** the Court of Chancery's decision to certify a non-opt out class under Delaware Court of Chancery Rule 23(b)(2) because "claims for equitable relief were originally predominant." *Id.* at 436.  The same reasoning as to certifying a non-opt out class here applies.

Moreover, while the objector in *Celera II-* and the objector alone- was permitted a "discretionary opt-out right," the Court's reasoning demonstrates why Mr. Berlin should not be permitted such a right here.  In *Celera II* the court held that the objector alone should be permitted to opt out because the class representative was "barely" adequate, and the objector was a "significant shareholder and was prepared independently to prosecute a clearly identified and supportable claim for substantial money damages[.]" *Id.*

The facts of this case do not resemble those in *Celera II* in any way.  In contrast to *Celera II*, the objector in this Action: (i) owned less than **0.006%** of the Company's outstanding common stock; (ii) does not argue that Plaintiffs failed to adequately represent the interests of the Class; (iii) is a party to the Settlement Agreement, does not provide any evidence that he opposed the Merger prior to filing his objection to the Settlement nearly a year after the Merger Agreement was first publicly announced; and (iv) has not indicated any clearly identified or supportable claim for substantial money damages or exhibited a willingness or desire to independently pursue claims for money damages against Defendants at any time, including  prior to the closing of the Merger, the execution of the Stipulation or in the Objection.  Consequently, the Objection does not state a valid

47

basis for a discretionary opt-out right, nor provide any instance where such a right has been granted under Texas or Delaware law.  As in *Celera II*, the Court should certify the non-opt out Class because Plaintiffs' claims seek predominantly sought equitable relief and all Class Members received the benefits of the Settlement.

Based on all of the above, Plaintiffs contend that the Objection is without merit and should not affect the Settlement.  Accordingly, the minimal nature of objection from Settlement Class members weighs heavily in favor of approving the Settlement.  *See Quintanilla*, 2008 U.S. Dist. LEXIS 37449, at *15 ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement'") (quoting *Wal-Mart Stores*, 396 F.3d at 118.

Additionally, the view of Plaintiffs' Counsel, while not conclusive, is "entitled to significant weight."  *Fisher Bros. v. Cambridge-Lee Indus., Inc*., 630 F. Supp. 482, 488 (E.D. Pa. 1985); *Ahearn v. Fibreboard Corp*., 162 F.R.D. 505, 528 (N.D. Tex. 1995).  Plaintiffs' Counsel believe that the Settlement is fair, reasonable, and adequate.

## V.     THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(a)

### A.     The Numerosity Requirement Is Satisfied

The class is so numerous that joinder of all members is impracticable.  According to the Partnership, as of July 30, 2014, approximately 58,840,314 units were outstanding.  *See Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding a class of 100 to 150 members satisfies numerosity and any more than 40 members should raise a presumption that joinder is impracticable).  In addition, the Settlement Class is too geographically dispersed to be easily joined into one action.  *See Stott v. Capital Fin. Servs.*, *Inc*., 277 F.R.D. 316, 324 (N.D. Tex. 2011).  Because there are hundreds if not thousands of QRE unitholders dispersed

throughout the United States, the proposed Settlement Class satisfies the numerosity requirement.

### B.      The Commonality Requirement Is Satisfied

The commonality requirement under Rule 23 (a)(2) is met where, as here, "there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). Here, issues common to the Settlement Class include, *inter alia*, (i) whether the Individual Defendants breached their implied covenant of good faith and fair dealing with respect to Plaintiffs and the other members of the Settlement Class in connection with the Merger and (ii) whether the Individual Defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder. As these claims affect the entirety of the Settlement Class equally, the proposed Settlement Class meets the commonality requirement.

### C.      The Typicality Requirement Is Satisfied

The typicality requirement is satisfied because Plaintiffs' claims arise from a similar course of conduct and assert the same legal theories as the claims of all Settlement Class members. *See Lohocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D. Tex. 2004) (typicality is found where claims raised by plaintiffs have "a common source and rest upon the same legal and remedial theories" and "[f]actual differences will not defeat typicality"). Here, the typicality requirement is satisfied where the claims arise from the same nucleus of operative facts, *i.e.*, the Merger between QRE and Breitburn.

### D.      The Adequacy Requirement Is Satisfied

The adequacy requirement is met where, as here, "(1) the named plaintiffs' counsel [prosecuted] the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting

control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members." *Hamilton v. First Am. Title Ins. Co.*, 266 F.R.D. 153, 163-64 (N.D. Tex. 2010); *see also Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ("[C]lass representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members."

Plaintiffs and their counsel have fairly and adequately represented and protected the interests of all Settlement Class members, as demonstrated by the record showing vigorous prosecution of this litigation.  Plaintiffs' Counsel is well qualified to litigate on behalf of the proposed Settlement Class as they have litigated numerous shareholder class actions throughout the country, including in this jurisdiction.[65]  Thus, Plaintiffs and Plaintiffs' Counsel satisfy the adequacy requirement.

### E.   The Proposed Settlement Satisfies Rule 23(b)

In addition to meeting all of the requirements of Rule 23(a), the proposed Settlement Class also satisfies both Rule 23(b)(1) and (b)(2).  Rule 23(b)(1) authorizes class certification if:

> (1) prosecuting separate actions by or against individual members would create the risk of:

>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1).  Rule 23(b)(2) authorizes class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

---

[65] *See* Bilek Decl., Exs. 15-18.

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *Rodriguez*, 695 F.3d at 365.   A class certified under Rule 23(b)(1) or (b)(2) is mandatory and members of the settlement class *may not* opt out.   *See Wal-Mart Stores,* 131 S. Ct. 2541 at 2558.

Because all Settlement Class members are unitholders of the Partnership challenging the same Merger between QRE and Breitburn, there is a substantial risk of varying or inconsistent results had there been multiple actions concerning the Merger.   For example, one court may have permitted consummation of the Merger, while another court may have enjoined the vote pending additional steps by the Board. *See, e.g.*, *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, No. CV 11-2768 PSG (SSx), 2013 U.S. Dist. LEXIS 155091, at *18 (C.D. Cal. Oct. 25, 2013) ("It would be inefficient to have individual members of the Class—who are likely geographically dispersed, given that CIL was a publicly-traded company—bring separate claims in scattered courts across the country. Such fragmentation would . . . create a risk of inconsistent judgments."); *see also In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 U.S. Dist. LEXIS 136962, at *29-30 (S.D. Ohio Aug. 18, 2009) ("Here, absent class certification, the various Shareholder Actions filed against the Defendants could result in inconsistent judgments, e.g., regarding whether the transaction should or should not proceed.").

Defendants are also alleged to have acted on grounds that are generally applicable to the proposed Settlement Class members in that the Merger affects all QRE unitholders similarly.   In other words, the relief obtained—dissemination of the Supplemental Disclosures—benefitted all members of the Settlement Class equally.   By providing this material information to unitholders prior to the unitholder vote, all QRE unitholders were able to make an informed decision whether to vote for, or against, the Merger.

## VI.   THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR REASONABLE ATTORNEYS' FEES AND EXPENSES

As provided in the Stipulation (¶ 3.1) Defendants acknowledge that this Action and Plaintiffs' Counsel's efforts were the reason and cause for the Supplemental Disclosures and have agreed to pay up to $472,500.00.   The Supreme Court has encouraged this type of consensual resolution of attorneys' fees as the ideal toward which litigants should strive.   For instance, in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court noted that a "request for attorney's fees should not result in a second major litigation. *Ideally, of course, litigants will settle the amount of a fee.*" *Id*. at 437 (emphasis added); *see also Ayers*, 358 F.3d at 375 (same).

It is well settled that the determination of reasonable attorneys' fees is left to the sound discretion of the district court.   *See Ranger Ins. Co. v. Algie*, 482 F.2d 861, 864 (5th Cir. 1973) (citing *Weeks v. S. Bell Tel. & Tel. Co.*, 467 F.2d 95, 97 (5th Cir. 1972)); *Jinks v. Mays*, 464 F.2d 1223, 1228 (5th Cir. 1972); *Culpepper v. Reynolds Metals Co.*, 442 F.2d 1078, 1081 (5th Cir. 1971)).

In determining the amount of an award of attorneys' fees, courts consider the following factors: (a) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (b) the time limitations imposed by the client or by the circumstances; (c) the fee customarily charged in the locality for similar legal services; (d) the results obtained; (e) the experience, reputation, and ability of the lawyer or lawyers performing the services; (f) whether the fee is fixed or contingent; and (g) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.   Tex. Disciplinary R. Prof'l Conduct Rule 1.04(b)[66]; *see also*

---

[66] Rule 1.04(b) also looks to the personal relationship with the client. *See* Rule 1.04(b)(5)-(6). The length of the professional relationship with the client is inapplicable to the instant analysis because Plaintiffs

*Sugarland Indus. v. Thomas*, 420 A.2d 142, 152 (Del. 1980); *United Vanguard Fund v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997); *PaineWebber R & D Partners II, L.P. v. Centocor, Inc.*, No. 14405, 2000 Del. Ch. LEXIS 12, at *10 (Del. Ch. Jan. 31, 2000).  Courts may also consider counsel fee awards in similar cases in determining the amount to be awarded. *See Dow Jones & Co. v. Shields*, No. 184, 1991, 1992 Del. Ch. LEXIS 24, at *3 (Del. Ch. Jan. 10, 1992).

Plaintiffs' Counsel respectfully submit that their request is fair and reasonable in light of the benefits achieved, awards in other similar cases, and other relevant factors.

### A.      Plaintiffs Conferred a Substantial Benefit on QRE Unitholders

The result achieved is an important factor to be considered in assessing the propriety of an attorneys' fee award. *Hensley*, 461 U.S. at 436 (considering the "most critical factor is the degree of success obtained"); *In re Ikon Office Solutions*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (citation omitted).  Courts have long permitted counsel who creates a benefit for others to recover their expenses, including reasonable attorneys' fees, from those who enjoy the benefit conferred.  *See Boeing Co. v. Van Gernert*, 444 U.S. 472, 478 (1980).  The substantial benefit doctrine is applicable in a class action context even when there is no ascertainable fund from which attorneys' fees can be paid, but the litigation has indirectly conferred substantial monetary or non-monetary benefit on an ascertainable group and the court has jurisdiction over both the subject matter of the lawsuit and the defendant.  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Fountain v. Avondale Indus.*, *Inc.*, No. 95-1198, 1996 U.S. Dist. LEXIS 5045 at *3 (E.D. La. Apr. 18, 1996) (concluding that "[g]uaranteeing the shareholder's right to accurate

---

served in a representative capacity on behalf of the proposed Settlement Class.

information in proxy statements is exactly the sort of corporate therapeutics" that warrants the award of attorneys' fees).

Here, after Plaintiffs filed the Amended Complaint, undertook expedited discovery, and engaged in good faith settlement negotiations, Defendants issued Supplemental Disclosures which substantially addressed Plaintiffs' disclosure deficiency allegations.

The Supplemental Disclosures, which were made prior to the unitholder vote on the Merger, permitted QRE unitholders to exercise their right to informed corporate suffrage by making a fully-informed decision on the Merger. *Fountain*, 1996 U.S. Dist. LEXIS 5045, at *2 (awarding attorneys' fees and recognizing that a shareholders "right to cast an informed vote, in and of itself is a substantial interest worthy of vindication") (citation omitted).[67]

### B. Fee Awards in Similar Cases and the Rates Charged in Similar Litigation

Here, the requested fee and expense award is eminently fair and reasonable based on similar shareholder actions from across the country where plaintiffs' counsel conferred non-monetary corporate benefits on behalf of shareholders. *See, e.g.*, *In re Crestwood Midstream Partners.*, No. 4:13-cv-01528, slip op. (S.D. Tex. May 16, 2014)[68] (awarding fees of $450,000 for supplemental disclosures); *In re MetroCorp Bancshares S'holders Litig.*, No. 4:13-cv-03198 (S.D. Tex. Oct. 23, 2014)[69] (awarding fees and expenses of $425,000 for supplemental disclosures and .5% reduction of termination fee); *Philips v. Texas Indus., Inc. et al,* No. 3:14-cv-

---

[67] It is also settled under Delaware law that curative disclosures confer a compensable benefit on the class for which class counsel can seek fees and expenses. *See, e.g.*, *In re FLS Holdings, Inc. S'holders Litig.*, No. 12623, 1993 Del. Ch. LEXIS 57, at *16 (Del. Ch. Apr. 2, 1993) ("Improved disclosures may certainly prove beneficial to class members and may constitute consideration of a type which will support a settlement of claims."). *See also Talley Indus.,* 1998 Del. Ch. LEXIS 53, at *46; *Staples*, 792 A.2d at 954.

[68] Bilek Decl. Ex. 11.

[69] Bilek Decl., Ex. 10.

00740-B (N.D. Tex. 2014)[70] (awarding fees and expenses of $360,000 for supplemental disclosures); *Pompano Beach Police & Firefighters' Ret. Sys. v. Odyssey Healthcare, Inc.*, No. CC-10-03561-E, slip op. at 7 (Dallas Cnty. Tex. May 18, 2012)[71] (awarding fees and expenses of $675,000 for additional disclosures); *Call4U, Ltd. v. Goodman Global, Inc.*, No. 2007-66888, slip op. at 5 (Harris Cnty. Tex. May 13, 2009)[72] (awarding $890,000 for additional disclosures and amendment to merger agreement); *In re Copano*, C.A. No. 8284-VCN (Del. Ch. Sept. 9, 2013) [73] (awarding $450,000 for additional disclosures); *Nichting v. DPL, Inc.*, No. 3:11-cv-141 (S.D. Ohio Feb. 24, 2012)[74] ($700,000 for disclosure-only settlement); *Collier v. Brightpoint, Inc.*, C.A. No. 1:12-cv-1016 (TWP)(DKL) (S.D. Ind. May 1, 2013)[75] ($600,000 for disclosure-only settlement); *In re Aeroflex S'holders Litig.*, No. 003943/2007 (Nassau Cnty. N.Y. June 30, 2009) (Transcript)[76] (awarding $850,000 fee for additional disclosures contained in proxy statements); *Plumbers Local #65 Pension Fund v. Nicor Inc.*, No. 10-CH-52627, slip op. at 4 (Cook Cnty. Ill. Cir. Ct. Dec. 7, 2011)[77] (awarding fees and expenses of $675,000 for additional disclosures); *Stein v. Pactiv Corp.*, No. 10-CH-35455, slip op. at 4 (Cook Cnty. Ill. Cir. Ct. Apr.

---

[70] Bilek Decl., Ex. 19.

[71] Bilek Decl., Ex. 20.

[72] Bilek Decl., Ex. 21.

[73] Bilek Decl., Ex. 22.

[74] Bilek Decl., Ex. 23.

[75] Bilek Decl., Ex. 24.

[76] Bilek Decl., Ex. 25.

[77] Bilek Decl., Ex. 26.

26, 2011) [78] (awarding fees and expenses of $860,000 for additional disclosures); *IBEW Local 164 Pension Fund v. Hewitt Assocs., Inc.*, No. 10 CH 31612, slip op. at 3-4 (Cook Cnty. Ill. Cir. Ct. Feb. 15, 2011)[79] (awarding fees and expenses of $850,000 for additional disclosures).

Additionally, the rates charged by Plaintiffs' Counsel are commensurate with the rates customarily charged by attorneys who actively litigate the complex and specialized practice area of shareholder actions. [80]  *See* Bilek Decl., Exs. 15-18; *see also Blum v. Stenson*, 465 U.S. 886, 895 (1984) (noting that reasonable fees should be calculated according to the prevailing market rates in the relevant community); *Hensley*, 461 U.S. at 447 ("[M]arket standards should prevail.").  "The Supreme Court in *Blum v. Stenson* . . . held that 'reasonable fees . . . are to be calculated according to the prevailing market rates in the relevant community,' *i.e.*, where counsel maintain their office . . ."  *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992) (citing *Blum*, 465 U.S. at 895); *see also Spencer v. Comserv Corp.*, No. 4-84-794, 1986 U.S. Dist. LEXIS 15863, at *32-33 (D. Minn. Dec. 30, 1986) ("Compensating a nationally recognized securities class action attorney at his hourly rate is entirely appropriate.").

Such rates necessarily reflect the reputation, experience, care, and successful record of Plaintiffs' Counsel.  "[T]he 'requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation,'" and, therefore, the rates are presumptively reasonable.  *Powell v. Comm'r of Internal Revenue*, 891

---

[78] Bilek Decl., Ex. 27.

[79] Bilek Decl., Ex. 28.

[80] *See National Law Journal 2015 Billing Survey* (reporting average partner billing rates between $715.00 and $1,055.00 per hour; and average associate billing rates between $290.00 and $678.00 per hour) (http://www.nationallawjournal.com/id=1202713809557/Billing-Rates-Rise-Discounts-Abound?slreturn=20150412191141 (Bilek Decl., Ex. 29).  The requested fee of $472,500 would represent an average hourly rate of approximately $700.50.

F.2d 1167, 1173 (5th Cir. 1990) (quoting *Blum*, 465 U.S. at 895-96 n.11); *see also Major v. Treen*, 700 F. Supp. 1422, 1434 (E.D. La. 1988) ("As the Supreme Court decisions have also made clear, experienced and expert attorneys who exhibit a high degree of skill have the right to have those factors calculated into the hourly rates.") (citing *Pa. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986)).

### C.    The Experience, Reputation, and Ability of the Lawyers Performing the Services, the Time Limitations, and the Preclusion of Accepting Other Employment

The experience, reputation, and ability of Plaintiffs' Counsel support an award of attorneys' fees.  It took considerable skill to achieve the Settlement.  Specifically, to successfully litigate the Actions, Plaintiffs' Counsel had to possess expertise in corporate law governing fiduciary duties of the officers and directors of a limited partnership, the federal securities law, as well as the knowledge to distill and analyze facts giving rise to Plaintiffs' claims from the thousands of pages of public and confidential documents that Plaintiffs' Counsel reviewed. Plaintiffs' Counsel are all well-respected law firms with extensive experience in class and shareholder litigation, thus giving them the ability to effectively advocate for Plaintiffs and pursue their claims.  *See* Bilek Decl., Exs. 15-18.

The efforts of Plaintiffs' Counsel were not conducted in a vacuum.  Aligned against them were some of the most prominent defense counsel in the country, equally knowledgeable of federal and state law and fully capable of capitalizing on any misstep or weakness, who could draw upon the exceptional resources of their well-regarded regional and national law firms.  The skills and abilities of defense counsel are factors that may be considered in evaluating a fee request.  *See, e.g.*, *In re Delphi Corp. Sec., Deriv. & ERISA Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008).

**D.      The Time and Labor Required, the Novelty and Difficulty of the Questions Involved, and the Skill Requisite to Perform the Legal Service Properly**

As discussed *supra*, the legal and factual issues were complex and required Plaintiffs' Counsel to use great skill in evaluating Plaintiffs' claims under tremendous time constraints.

To pursue Plaintiffs' claims, Plaintiffs' Counsel expended approximately 674 hours of attorney and paralegal time in prosecuting the Action on behalf of the Class.  *See* Bilek Decl., Exs. 15-18.  This work was necessary, performed without duplication to the extent possible, and resulted in the Settlement, which as discussed above, benefited the Class.  As indicated, the regular hourly rates of Plaintiffs' Counsel (which, as discussed *supra*, are within the range charged by attorneys in similar actions) results in a total lodestar of $440,150.75.  *In re Dell, Inc., Sec. Litig.*, No. A-06-CA-726-SS, 2010 U.S. Dist. LEXIS 58281, at *39 (W.D. Tex. June 11, 2010) ("[T]he lodestar method [asks the court to] multiply[] the number of reasonable hours expended by a reasonable hourly rate and applying a lodestar multiplier.").

**E.      Plaintiffs' Counsel Litigated the Action on a Fully Contingent Basis**

Courts in the Fifth Circuit recognize that the contingent nature of the fee also must be taken into account in awarding attorneys' fees.  *See In re Prudential-Bache Energy Income P'ships Sec. Litig.*, No. 888, 1994 U.S. Dist. LEXIS 6621, at *21 (E.D. La. May 18, 1994) (contingent fee awards should "fairly and adequately compensate counsel . . . . for the risks of pursuing such litigation and the benefits which would not otherwise have been achieved but for their persistent and diligent efforts"); *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 718-19 (5th Cir. 1974); *McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967) ("The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services.").

Plaintiffs' Counsel undertook representation in this case on a wholly contingent basis, knowing that they would devote many hours of hard work, on a compressed time-frame, to prosecute a difficult case, without any assurance of receiving fees or even reimbursement for their out-of-pocket expenses.  Accordingly, this factor supports the requested fee award.

## VII.    CONCLUSION

For the reasons set for above, Plaintiffs respectfully request that the Court enter the accompanying Judgment and Order of Dismissal, thereby finally: (a) approving the Settlement; (b) certifying the Settlement Class for settlement purposes; and (c) approving Plaintiffs' request for reasonable attorneys' fees and reimbursement of expenses.

DATED: August 20, 2015

Respectfully submitted

By:  */s/ Thomas E. Bilek*
      Thomas E. Bilek
TX Bar No. 02313525/ SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Counsel for Plaintiffs*

**COUNSEL FOR PLAINTIFF STEPHEN
BUSHANSKY:**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
**WEISSLAW LLP**
1500 Broadway, 16th Floor
New York, NY  10036
Tel: (212) 682-3025
Fax: (212) 682-3010

**COUNSEL FOR PLAINTIFF HARRY J.
TAYLOR, AS GRANTEE FOR ROY E.
TOLER, MICHELLE BURT, MICHAEL
TAYLOR, AND JENNIFER TAYLOR:**
Evan Smith

Marc L. Ackerman
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
Tel: (610) 667-6200
Fax: (610) 667-9029

**COUNSEL FOR PLAINTIFF SAMUEL R.
HOEFGEN:**
Shane T. Rowley
Justin G. Sherman
**LEVI & KORSINSKY LLP**
30 Broad Street, 24th Floor
New York, NY  10004
Tel: (212) 363-7500
Fax: (212) 363-7171

CERTIFICATE OF CONFERENCE

I certify that Plaintiffs' counsel conferred with Defendants' counsel, who is not opposed to this motion; it is only opposed by the objector.

_/s/ Thomas E. Bilek_
Thomas E. Bilek

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed via the Live District CM/ECF System on August 20, 2015, which caused an electronic copy of same to be served automatically upon all counsel of record.

_/s/ Thomas E. Bilek_
Thomas E. Bilek